# STUBBS vs. HOUSTON.

[CONTESTED PROBATE OF WILL.]

1. *Burden of proof as to testator's capacity.*—When the probate of a will is contested on the ground of the insanity or mental incapacity of the testator, it is not incumbent on the proponent, in making up the issues, to affirm that the testator was of sound mind ; nor is the *onus* on him of proving sanity.

2. *Relevancy of evidence to prove undue influence or insanity.*—The fact that the testator, several months after the execution of his will, executed a deed conveying all his property to a trustee, to be managed and controlled for him, and that this was done, at the instance of his friends, for the purpose of placing him in an advantageous position to contest the validity of a contract which he had previously made, is relevant evidence for the contestants, as affecting the questions of the testator's mental capacity and susceptibility of influence from others.

3. *Same.*—Whether a will is natural, is a legitimate inquiry, when its validity is contested on the grounds of undue influence and insanity ; and, as affecting that question, the pecuniary circumstances of the testator's nephews, who, in the event of his intestacy, would have been the distributees of his estate, are relevant and pertinent evidence.

4. *Same.*—The fact that the testator, after the execution of the paper propounded as his will, gave a mortgage to secure a debt not really due, or for a sum much greater than was really due, is also competent evidence for the contestants, as bearing on the question of his intellectual condition and capacity.

5. *When witness may give opinion as to testator's sanity.*—A witness who had known the testator from childhood, and been intimate with him, is competent to give his opinion as to the latter's mental *status* generally, although he seldom saw him during the two or three months which immediately preceded the execution of the will.

6. *Implied revocation of will.*—The subsequent execution by the testator of a mortgage on a part of his property, does not operate an implied revocation of his will, (Code, § 1603,) although such mortgage was procured by the sole beneficiary under the will, and was executed by the testator, under the belief that the will was invalid, and with the intention that it should revoke, and be substituted for the will.

7. *Standard of testamentary capacity.*—Although any person, possessing capacity sufficient to transact the ordinary business of life, is capable of making a valid will ; yet it cannot be asserted, " that the standard of capacity, fixed by law, as requisite to the making of a will, is such as enables a man to transact the ordinary business of life :" on the contrary, a person may be competent to make a will, without possessing such capacity as would enable him to transact the ordinary business of life.

8. *Same.*—A total deprivation of reason or understanding is not requisite to destroy testamentary capacity.

9. *Opinion of witness on question of insanity.*—The fact that a witness, who had an opportunity of forming a correct judgment of the testator's sanity, is unable to state all the circumstances on which his opinion is predicated, or that the circumstances stated by him do not justify his opinion, does not authorize the court to exclude his opinion as evidence, or to instruct the jury to disregard it.

APPEAL from the Probate Court of Dallas.

IN the matter of the last will and testament of John A. Stubbs, deceased, which was propounded for probate by James B. Stubbs, who was a brother of the testator and the sole beneficiary under his will, and was contested by the appellees, who were the children of a deceased sister of the testator. The paper propounded for probate was dated the 13th August, 1855, attested by three witnesses, and was in the following words:

"State of Alabama, ⎱ In view of the uncertainty of
  Dallas County. ⎰ human life, and in consideration of the natural love and affection that I bear for my brother, James B. Stubbs, I bequeath to him all of my property, both real and personal, and all evidences of property of which I may die possessed, and all choses in action, notes and accounts, a negro boy named George, copper-colored, a son of Lenette; also, my horse and buggy, and all money that I may have on hand; and for my brother, James B. Stubbs, to have and to hold to his exclusive use, for him and his heirs forever, I declare it as my unequivocal intention and will, for him to have all my property, of whatever kind, at my death, and that he may not be prevented for the want of form in this will, which I declare as my last will and testament. I will him all my property at my death, for him to have and to hold, for his use and his heirs forever. In witness whereof, I set my hand and seal."

In the *caveat* filed by the contestants, they objected to the probate of the will on the grounds, "that the testator was laboring under an insane delusion when he signed the paper, and was incapable of making a will from mental imbecility," and that it was procured by fraud and undue influence on the part of the proponent. "The application

for the probate of the will was made by the proponent orally; and the issues coming to be made up under the directions of the court, the proponent took issue on the grounds of objection set out in the *caveat.* The contestants then insisted, that the proponent should allege in writing, at this stage, that the paper propounded for probate was duly executed, and that the testator was of sound mind at the time it was executed. The court required the proponent to do this, against his objection; to which he excepted, and thereupon submitted the following allegations in writing: 'The proponent, James B. Stubbs, as the sole devisee in said will, offers for probate the last will and testament of John A. Stubbs, and avers, that the same was duly executed, and that he was of sound mind at the time said will was executed.' The contestants took issue on said allegations, 'denying the same, and denying that the paper propounded for probate is the last will and testament of said John A. Stubbs.'"

The proponent introduced two of the subscribing witnesses to the will, who testified, in substance, that the will was written by one Brantley, (one of said witnesses,) at the instance of the proponent; that it was signed by the testator, on the day of its date, in the presence of the three attesting witnesses, and was attested by them in the presence of the testator and of each other; that the testator was a man of ordinary mental capacity, but somewhat below mediocrity; that he had always attended to his own business affairs, and, when sober, was capable of transacting ordinary business; that he had been sick several weeks when the will was executed, but his illness had not impaired his mind; and that he had, in their opinion, sufficient mental capacity to make a will. It was shown that the third attesting witness had removed from the State.

On cross examination of the witness Brantley, the contestants asked him, "what was the pecuniary condition of the contestants at the date of the will?" The proponent objected to this question, but the court allowed it to be asked; and the witness answered, "that they had some property, though they were not wealthy." An

exception was reserved by the proponent to this ruling of the court.

On cross examination of said Brantley, the contestants asked him, "if he had not, at the instance of the proponent, accepted the trusteeship of certain property conveyed to him by the testator; if said deed did not convey all the property owned by the testator; if it was not made because the testator was incapable of attending to his business, and some one else had to do it for him; if said trusteeship was not created with the advice and consent of the proponent; and if the testator and the proponent had not executed to each other, in writing, releases of all obligations between them growing out of a trade made between the testator and the proponent with one Pool?" In reply to these questions, the witness stated, in substance, that in December, 1855, the testator had conveyed to him, by deed of trust, all the property which he knew the testator possessed; that he accepted the trust, and was to manage and control the property for the benefit of the testator; that this deed was executed after consultation with the testator's friends, the proponent being present when it was agreed on, "and was made for the purpose (more than for anything else) of placing the said testator in an advantageous position to contest the validity of his said contract with Pool;" that said contract with Pool was a contract by which the testator sold certain lands and negroes to him and the proponent, and "in which it was thought said Pool had swindled him;" that the testator, at the time this deed was executed, executed a release to the proponent from all liability on the notes given to him and Pool, and the proponent executed to him a quit-claim deed for the land and negroes embraced in the contract; and that all this was done for the purpose of assisting the testator to obtain a rescission of the contract with Pool. "The proponent moved the court to exclude what the witness stated in regard to the trusteeship, the trust deed, and the other deeds; but the court overruled his motion, and said, that he would instruct the jury upon the effect of the evidence when all the evidence in the case was introduced; to which refusal of the court

the proponent excepted." The deeds referred to were read in evidence, against the proponent's objection, and he excepted to their admission.

It appeared that the testator recovered from the attack of sickness under which he was laboring at the time the will was executed, and did not die until February, 1857; that at the time said will was executed, the proponent executed a similar will in his favor; that these wills were executed under an agreement between the two brothers, to the effect that the one who died first should bequeath all his property to the other; and that the testator, in a conversation had with Brantley after his recovery, expressed his satisfaction with the will, and requested Brantley to preserve it. The contestants read in evidence, after proof of its execution, a mortgage executed by the testator on all his slaves, dated January 31, 1857, and purporting to have been given to secure the payment of two promissory notes, due from the testator to the proponent, dated January 31, 1857, payable one day after date, and together amounting to over $10,000. The proponent objected to the admissibility of this mortgage as evidence, and reserved an exception to the ruling of the court in admitting it. He also adduced evidence tending to show, that the testator's motive in executing this mortgage was, to screen his property from a judgment, which he feared might be recovered against him, in an action of trespass for an illegal arrest, instituted against him and others by one Summerlin.

The contestants introduced several witnesses, physicians, and acquaintances of the testator, who testified to his general weakness of mind, incapacity for business, and habitual intoxication. "One W. B. Andrews, examined by the contestants, testified, that he had known the testator from childhood, and was raised in the same neighborhood with him; that he was a boy of very ordinary mind, and, after he grew up, became much addicted to drink; that he removed to Clarke county in 1850 or 1851, and returned to Dallas in 1855; that witness frequently saw him, during the intermediate time, when he came up to Dallas on visits; that after he came back to

Dallas, he staid at W. B. Hall's, near where witness resided; that witness, being then a candidate for sheriff, and out electioneering in the county, did not see him often; that he was generally drunk, or under the influence of liquor, when witness saw him; that witness had known him always, and had an intimate acquaintance with him; and that, from his knowledge of him, he did not think him of sound mind, or competent to make a will. The proponent objected to this witness giving his opinion of the testator's sanity or insanity; but the court allowed the witness to express his opinion, and the proponent excepted."

All the evidence adduced on the trial is set out in the bill of exceptions, but a further statement of it is not material to the points considered and decided by this court.

"The court thereupon instructed the jury as follows:

"1. That he would permit them to look to the mortgage read in evidence, to determine whether there was a revocation of the will or not; and that he would allow the mortgage and other instruments read in evidence, each separately, or all together, to the jury, for the purpose of showing whether the testator, at the time of making the will, was of sound mind or not, or whether the will was procured to be made by fraud or undue influence, or whether there was a revocation of it or not.

"2. That the standard of capacity, fixed by the law, as requisite to the making of a will, was such as enabled a man to transact the ordinary business of life."

The proponent excepted to each of these charges, and then requested the court to give twenty-eight written charges; all which the court gave as asked, except the following:

"23. That the unsoundness of mind, which justifies the setting aside of a will, must not be mere weakness, or imbecility, but must be a total deprivation of reason." This charge the court qualified, by adding, "that the testator, to make a will, must have capacity enough to know how to attend to the ordinary business of life;" to which

qualification, as well as to the refusal of the charge as asked, the proponent excepted.

" 24. That a person of imbecile mind, in the sense of the law, as respects legal capacity or incapacity, is distinguishable from one who is a lunatic, a fool, or an idiot; and as weak minds differ from strong ones only in the extent and power of their faculties, unless they betray a total loss of understanding, or idiocy, or delusion, they cannot be properly considered of unsound mind." This charge the court qualified, by adding, " that it did not require a total loss of understanding to render one properly of unsound mind;" to which qualification, as well as to the refusal of the charge as asked, the proponent excepted.

" 25. That although the testator's understanding may have been obscured, and his memory troubled, from habitual intoxication; yet, to render his will void in law, he must, at the time of the execution, either have labored under general insanity, or been so excessively drunk as to be utterly deprived of his reason and understanding." This charge the court qualified, by striking out the word " *utterly* ; " to which qualification, as well as to the refusal of the charge as asked, the proponent excepted.

" 26. That in making up their verdict, the jury should not regard as evidence the opinions of witnesses, except physicians and the subscribing witnesses, unless the facts are stated upon which those opinions are founded; and even when the facts are stated, no weight should ·be given to the opinions of the witnesses, unless, in their judgment, the facts stated authorized those opinions." This charge the court gave, but with this qualification, " that if the witnesses had an intimate acquaintance with the testator, and had seen him transact business, then their opinions should be received;" to which qualification, as well as to the refusal of the charge as asked, the proponent excepted.

" 27. That neither the mortgage, nor the other instruments read in evidence, could be looked to by the jury, as furnishing any evidence of the revocation of the will pre-

viously executed;" which charge the court refused to give, and the proponent excepted. .

The court charged the jury, at the request of the contestants, among other things, as follows:

" 1. That the burden of proof is on the party propounding the will, to show that the testator, at the time of its execution, was of sound mind; that when such proof is made, it then devolves on the contestants to show that the will was made by fraud or undue influence; yet, if the will was unnatural, and was made by a person of imbecile mind, and who was greatly depressed, both in mind and body, by sickness and *mania a potu*, the inference naturally arises that it was procured by circumvention, or undue influence; and, in such a state of case, it devolves on the proponent to show that such fraud or influence was not exerted when the will was made, especially where the will was made at the instance and suggestion of the sole legatee under it."

" 4. If the proponent is the sole legatee under the will, and procured the testator to execute to him a mortgage on all his property, to secure a debt that was not due; and if he procured the mortgage because he believed said will to be invalid; and if the testator executed the mortgage for the same reason, intending it to revoke and be substituted for the will,—that this would be a revocation of the will, if the mortgage was executed after the date of the will."

To these charges the proponent excepted.

The appeal is prosecuted by the proponent, who assigns as error all the rulings of the court to which he reserved exceptions.

ALEX. WHITE, J. R. JOHN, and JONA. HARALSON, for the appellant.

JOHN T. MORGAN, *contra*.

A. J. WALKER, C. J.—Upon the question of the *onus* of proof as to testamentary capacity, the authorities are conflicting: many of them holding, that it is for the proponent of a will to prove the sanity of the testator,

(Dunlap v. Robinson, 28 Ala. 100; Wallis v. Hodgson, 2 Atk. 55; Powell on Devises, 82; Gerrish v. Nason, 22 Maine, 438; Potts v. House, 6 Geo. 324; Harris v. Ingledew, 3 P. Wms. 93; Brooks v. Barrett, 7 Pick. 94; Comstock v. Hadlyme, 8 Conn. 26;) while many others hold, that the presumption of sanity applies as well to probate as other cases.—Saxon v. Whitaker, 30 Ala. 237; Pettes v. Bingham, 10 N. H. 514; Jackson v. Van Dusen, 5 Johns. 144; Rogers' Ecclesiastical Law, 900; Groom & Evans v. Thomas & Thomas, 2 Hagg. 433; Burrows v. Burrows, 1 Hagg. 109; 1 Jar. on Wills, 74, and note; 2 Greenleaf on Ev. 689; Sloan v. Maxwell, 2 Green's Ch. 580; 1 Williams on Ex. 18; Lessee of Hoge v. Fisher, 1 Pet. C. C. R. 163.

The *prima-facie* intendment in favor of testamentary capacity, when an issue for the contestation of a will is made up, is consistent with the presumption, generally made, that men are sane; and is required by the principle enunciated in the recent decision of this court in Saxon v. Whitaker, *supra;* and is the only rule which can harmonize with the law allowing the admission of a will to probate upon proof of handwriting, when the attesting witnesses are dead, insane, or out of the State, or have became incompetent since the attestation. We decide, therefore, that it was not incumbent upon the proponent to affirm the testator's sanity in making up the issue; and that there was error in the instruction to the jury, that the *onus* of proof as to the question of sanity was upon the proponent.

[2.] The testimony as to the execution of the trust deed to Brantley, with the attending circumstances, and the fact of the testator's seeking a rescission of his contract of sale, and employing the agency of a trustee to procure it, (whether remote or immediate, it is not for us to decide,) had a bearing upon the question of the testator's capacity and susceptibility of influence from others. That testimony, and the reciprocal instruments executed by the testator and his brother at the time, were, therefore, admissible.

[3.] A legitimate inquiry in the contest of a will upon

the ground of undue influence and insanity, is whether the will is natural. To that inquiry, the pecuniary condition of the testator's nephews, who would have been distributees of his estate in case of intestacy, was pertinent; and the evidence upon that subject was admissible. Roberts v. Trawick, 13 Ala. 68; Coleman v. Robertson, 17 Ala. 84; Gilbert v. Gilbert, 22 Ala. 529; Couch v. Couch, 7 Ala. 519.

[4.] The fact of the testator's giving a mortgage after the execution of the will, to secure a debt really not due, or for a sum much larger than was really due, was pertinent to the question of his intellectual condition; and the evidence tending to show those things was properly received. Whether the evidence required explanation, or was sufficiently explained, it is not our province to decide. McAllister v. State, 17 Ala. 434; McLean v. The State, 16 Ala. 672; Walker v. Clay, 21 Ala. 797.

[5.] Under the decisions in this State, the testimony shows the existence of such an opportunity on the part of the witness, Andrews, to know and form a correct judgment upon the mental *status* of the testator, that it was competent for him to give his opinion in connection with the facts deposed to by him. Whether the facts stated were, as is contended, insufficient to justify his conclusion, was a question for the jury.—Powell v. The State, 25 Ala. 21; Florey v. Florey, 24 Ala. 241; Norris v. The State, 16 *ib.* 776; Roberts v. Trawick, 13 *ib.* 84; Bowling v. Bowling, 8 *ib.* 538; State v. Brinyea, 5 *ib.* 241; 1 Jar. on Wills, 75, note 2; but see, also, McCurry v. Hooper, 12 Ala. 823, which seems to contain expressions inconsistent with the other cases. The exception to the testimony of Andrews applies *alone* to his opinion upon the question of *sanity*, and we merely decide that the *exception* is not well taken.

[6.] The mortgage, executed by the testator after making his will, does not manifest any intention on the part of the mortgagor to revoke the pre-existing will, nor is any such intention deducible from the will itself. Section 1603 of the Code says, "that a charge or incumbrance upon any real or personal property, to secure any

money, or the performance of any contract, does not operate as a revocation of any devise or bequest of such estate previously executed, unless it appears from the will, or instrument creating such charge or incumbrance, that such was the intention of the testator." If the entire subject-matter of the bequests is covered by the mortgage, this statute presents an insuperable barrier to the conclusion, that the bequests are revoked by the subsequent mortgage. But at common law, the mortgage would not, of itself, operate an entire revocation of the will. The reasons why it would not are obvious, and are set forth in 1 Jarman on Wills, 171, marg. 131. But furthermore, the testator, as it was competent for him to do, bequeathed, in general terms, all his property at his death to his brother, the proponent.—Code, § 1502. The mortgage could not, of itself, effect a revocation of such a bequest; nor could any subsequent conveyance of a part of the property, or change in its character, effect such revocation. Any interest, or right of redemption, or other right remaining in the testator at his death, would fall within the operation of the bequest. The deed of trust to Brantley, and the rescission by the testator of his contract of sale, would not revoke the will.

But one of the charges assumes the position, that although the mortgage may not, *per se*, revoke the will; yet it did have that effect, if it was made to the sole beneficiary under the will, and such beneficiary procured it because he believed the will to be invalid, and the testator executed the mortgage for the same reason, intending that it should revoke and be substituted for the will. This charge does not present any of the cases of revocation mentioned in article 1, chap. 2, title 4, part 3 of the Code. Excepting the cases provided for in that article, section 1613 of the Code prohibits the revocation of a will, unless by burning, tearing, canceling, or obliterating the same, with the intention of revoking it, by the testator himself, or some person in his presence, or by his direction, or by some other will in writing, or some other writing of the testator, subscribed and attested according to the requisitions of the section prescribing the mode of

execution and attestation of wills. The facts presented in the charge under consideration, certainly do not describe any one of the modes to which the power of revocation is limited by our statutes, and the court erred in treating them as evidencing a revocation of the will.

[7.] One of the charges given asserted, that "the standard of capacity fixed by the law, as requisite to the making of a will, was such as enabled a man to transact the ordinary business of life." It is probable, that this charge was induced by a misapprehension of a remark by this court in the case of Coleman v. Robertson, 17 Ala. 84–87. The remark is as follows: "We do not apprehend, that any one will doubt, that any person is capable of making a will, who possesses sufficient capacity to transact the ordinary business of life." This was said in reference to a charge objected to by the contestant of a will. The object was not to define a test of testamentary capacity, but simply to show that a capacity to transact the ordinary business of life was not below the standard of testamentary capacity, and that therefore the contestant had no right to complain. The assertion that a man is competent to make a will, who has capacity to transact the ordinary business of life, is a very different thing from making the capacity to transact the ordinary business of life the test or standard of testamentary capacity. It might with truth be said, that a lawyer, capable of conducting and arguing with professional skill a complicated case, involving difficult and abstruse questions, had a testamentary capacity; yet it would not follow, that a competency for such a task was the standard by which to decide the question of competency to make a will. There is, therefore, in the case referred to, no authority for the charge.

In Taylor v. Kelly, 31 Ala. 59, we said; if the testatrix "had memory and mind enough to recollect the property she was about to bequeath, and the persons to whom she wished to will it, and the manner in which she wished it to be disposed of, and to know and understand the business she was engaged in, she had, in contemplation of

law, a sound mind; and her great age, bodily infirmity, and impaired mind, would not vitiate a will made by one possessing such capacity."—1 Jar. on Wills, 50, 51, 52, 53, and notes; 1 Wms. on Ex. 35, and notes; Stevens v. Van Cleve, 4 Wash. C. C. R. 262; Rawdon v. Rawdon, 28 Ala. 565; Coleman v. Robertson, 17 Ala. 84; McElroy v. McElroy, 5 Ala. 81.

There may be a competency to make a will, without such capacity as would enable a man to transact the ordinary business of life. Feebleness of intellect, or the childishness and fretfulness of old age, not amounting to mental unsoundness, might make one unfit for the active business transactions of life, which would require prompt action upon newly presented subjects, with combinations to which the mind was unaccustomed; and yet there might be a full capacity to make a will. The rule which would make a capacity for the management and transaction of business generally the standard of testamentary capacity, is repudiated in Kinne v. Kinne, 9 Conn. 102, and Harrison v. Rowan, 3 Wash. C. C. R. 586.

Our argument does not interfere with the decision in McElroy v. McElroy, 5 Ala. 81, which seems to analogize the capacity to make a will with that which is necessary to make a contract; for it is conceivable, that one might have a sound mind, and be competent to make a contract, and yet be unfitted for engagement in the active duties of the business world. Certainly, an incapacity to transact the ordinary business of life would afford ground for an argument to the jury, but it cannot, consistently with reason or law, be made the standard of testamentary competency.

[8.] A total deprivation of reason is not requisite to destroy testamentary capacity. *Dementia*, and idiocy, are not the only forms of incapacity. A competent testator must not only have mind and memory, but mind and memory enough to understand the business in which he is engaged. There was, therefore, no error in the first three refusals to charge.

[9.] One of the reasons why one occupying a relation of peculiar intimacy with a person whose sanity is dis-

puted, is permitted to express an opinion, is that it may be impossible for him to state all the minute circumstances, and to precisely describe the conduct and appearance, which are, in part, the predicate of his opinion. It may be, therefore, that an opinion as to intellectual soundness is correct, notwithstanding the witness might not be able to state facts from which his conclusion would be a necessary sequence. It does not necessarily follow, therefore, that the opinion of a witness should be excluded, because he is unable to state everything upon which it is based; or that it should be totally disregarded, because the facts actually stated may not justify the conclusion. There was no error in the fourth refusal to charge as requested by the proponent.

We think the points decided will cover the points likely to arise upon another trial, and we therefore decline to pass upon the other questions presented.

The judgment of the court below is reversed, and the cause remanded.