## In re CARMICHAEL.

[INQUISITION OF LUNACY.]

1. *Form and sufficiency of verdict.*—It is the safer and more satisfactory practice to have the verdict in the very language of the statute, (Code, ₴2753,) or its substance.
2. *Meaning of non compos mentis.*—The term *non compos mentis* denotes neither mere mental weakness, nor a total deprivation or destruction of the intellectual powers, but simply unsoundness of mind.
3. *Proof of unsoundness of mind.*—The fact that a person makes one or more improvident bargains, or is generally unthrifty or unsuccessful in his business, does not, *per se*, prove him to be *non compos mentis ;* but it is admissible evidence, in connection with facts and circumstances tending to show mental unsoundness.
4. *Opinion of witness on question of sanity.*—On the question of sanity *vel non,* a witness who, though not a physician, has had an intimate acquaintance with the party, may give his opinion, in connection with the facts on which it is based ; *secus,* as to one who has had a mere passing acquaintance, or brief and occasional interviews on general or indifferent subjects.

5. *Relevancy and admissibility of evidence on question of sanity.*—On the trial of an inquisition of lunacy, a witness cannot be asked, "whether his brother did not control the defendant and his business;" nor, "whether he is not going down hill generally;" nor, "whether his appearance was that of a man of sound or unsound mind;" nor can he be allowed to state " the *impression* that the defendant made on his mind;" nor what the petitioner, who was the defendant's brother, told him on different occasions about the defendant's behavior.

6. *Opinion of physician.*—A practicing physician, who states that, "having been requested to examine the defendant, in order to test the condition of his mind, he met and conversed with him, and noticed his general expression and appearance, but had formed no settled opinion as to the depth of his mind," may be asked whether he discovered any evidence of unsoundness of mind, and may state his opinion on the question of sanity *vel non.*

7. *Cross-examination of witness.* —If a witness betrays bias, partiality, or corruption, the appellate court will lay down no rule as to the questions which may be asked him on cross-examination : "that must be, in a great degree, left to the discretion of the presiding judge."

APPEAL from the Probate Court of Talladega.

In the matter of Malcolm Carmichael, on the petition of his brother, Daniel Carmichael, to have him declared *non compos mentis.* The principal matters here assigned as error are the several rulings of the court on the trial, which are thus stated in the bill of exceptions :

"The petitioner introduced as a witness one Geo. McD. Patterson, who testified, that he had known the defendant sixteen or seventeen years; that he now lives about fifteen miles from him, and knows him as intimately as he knows his other neighbors; that he lived within four or five miles for five or six years, and within two miles for four or five years; that he saw him frequently, and knew of the following business transactions with him: he had hired a negro man to him (witness) at $10 per month, which was a fair price ; witness had ginned some cotton for him and one Shaw, which they afterwards took to the Wetumpka market, and on the returns, which witness saw, the smallest bag was marked to the defendant, although he had brought to the gin one hundred pounds more than Shaw; and he sold a negro woman and five

children, to one McNeill, for $1,300. From these facts, and the general appearance and conversation of the defendant, the petitioner asked said witness to give his opinion as to the soundness of the defendant's mind. The defendant objected to this question, on the ground that it was illegal, and that the witness had not laid a sufficient predicate to give an opinion. The court overruled the objections, and the defendant excepted. The witness also stated, on his direct examination, that he refused to trade with the defendant on one occasion, without the consent of Daniel Carmichael; which answer the defendant moved to exclude, and excepted to the overruling of his motion. The petitioner then asked the witness, whether or not Daniel Carmichael controlled the defendant and his business; to which question the defendant objected, and excepted to the overruling of his objection."

"The petitioner also introduced one Daniel McDearmid, who stated, that he had known the defendant for sixteen or seventeen years, had frequently conversed with him, lived within two or three miles of him, met him frequently, and had some business transactions with him; that he had sold a beef to the defendant at $10, which defendant told him was worth $12 or $13, but did not offer him that much; that one of his neighbors, wanting to hire a small boy, plow and horse, to plow in wheat, offered defendant one bushel of wheat per day for them, but defendant said a half-bushel was enough; that he saw one of the defendant's negroes, when defendant was not present, in the woods hunting; and that the defendant stammers, and steps high. Upon these facts, the petitioner asked the witness his opinion as to the soundness of the defendant's mind. The defendant objected to the question, and excepted to the overruling of his objection." This witness having further stated, that the defendant had been living by himself on his farm for five or six years, the court permitted the petitioner to ask him these questions: "Has he made a living each and every year since he has lived there?" "Is he not going down hill generally?" "Has he less property now than he had some

years ago?" The defendant objected to each of these questions, "as illegal, irrelevant, and leading;" and reserved exceptions to the overruling of his several objections.

"The petitioner then introduced one Thomas Smith as a witness, who stated, that he had known defendant for sixteen or seventeen years, had a passing friendly acquaintance with him, and had talked with him frequently; that defendant has a hesitancy in talking, lives some ten or twelve miles from him, and knows something about the price of goods; that he (witness) sold him a few goods, and he always made his settlements correctly; that he offered defendant a piece of goods at sixty cents a yard, but defendant refused to give it, and said that twenty-five cents was enough. Upon these facts, and from the general appearance of the defendant, the petitioner asked the witness his opinion as to the soundness of the defendant's mind." To this question, and to the answer thereto, the defendant objected; the court overruled the objections, and the defendant excepted.

The petitioner also introduced as a witness one Wayman Adair, who testified, "that he had known defendant several years, met him in passing, and had some conversation with him; that he had lived within two or three miles of him for three or four years, and now lives ten or twelve miles from him; that he is a man who does not talk much; that he had known him to buy a piece of land, but thought he gave a long price for it; that he also knew of the sale of the negroes to McNeill at $1300, and considered them worth $1800, sound or unsound." On these facts, the court allowed this witness, against the defendant's objection, to state his opinion as to the soundness of the defendant's mind; to which the defendant excepted.

James H. Joiner, another witness introduced by the petitioner, testified, "that he lived about twenty-six miles from the defendant, had met him only twice, and had a short conversation with him each time; that in one of his interviews with him the defendant had some little slips of paper with figures on them, and asked him to

In re Carmichael.

print them for him ; that he refused to do so, and that the defendant looked rather peculiar." The court permitted the petitioner to ask this witness, " What was the defendant's appearance ? was it that of a man of sound or unsound mind ?" "and to state to the jury the impression that the defendant made on his mind." The defendant objected to each of these questions, and reserved exceptions to the overruling of his objections.

A. D. Levi, another witness of the petitioner, stated, " that he had known the defendant for fifteen or sixteen years, but had never conversed much with him ; that he had stayed at the same house with him for three months, but only saw him at night and morning; that the negroes would not obey the defendant sometimes, when he called them to get up and make a fire; and that he was never over the defendant's farm." On these facts, the court permitted the witness to be asked his opinion as to the soundness of the defendant's mind ; to which he answered, " His mind is not altogether sound." To this question and answer, each, the defendant objected ; and reserved exceptions to the overruling of his objections.

" J. M. Munroe, another witness for the petitioner, stated, that the defendant had acted as bailiff in his beat, and had been deputed on one occasion, by one of the acting magistrates of the beat, to levy an attachment on a trunk to save a debt due him ; that he pointed out the trunk to the defendant, who made the levy and return properly and regularly. The petitioner then asked the witness, 'Did not Daniel Carmichael enjoin upon you to go with the defendant, and see that he executed the process properly ?'." The court allowed the question to be asked and answered, against the defendant's objections, and he excepted.

" Robert McMillan, another witness for the petitioner, stated, that the defendant had lived with Daniel Carmichael several years ago, and, on one occasion, started on a trip to Tuskaloosa for said Daniel, with his wagon and team, to move a man by the name of Barker ; that when he got to Tuskaloosa, he engaged to move said Barker to Mississippi ; that when he got to Mississippi, Barker would

In re Carmichael.

not or could not pay him, and he was out of money, and swapped off one of the horses out of the team to get money to bear his expenses home; that he was gone about six weeks, and that Daniel Carmichael started after him; and that said Daniel told him (witness) that he met defendant, and put a barrel of whiskey in the wagon, and the barrel was in the wagon when it and the defendant got home. The defendant moved to exclude that part of the answer containing Daniel Carmichael's declaration, because it was illegal and irrelevant; and excepted to the overruling of his objection."

" The defendant introduced one Malcolm McMillan as a witness, who testified, that he had known the defendant for six or seven years, lived within two miles of him, had met and conversed with him frequently on various topics, and was intimately acquainted with him; that he had sold him a steer for twenty bushels of wheat, and ground the wheat for him, and defendant sold the flour for $20 80, which was a fair price for the steer; that he had first offered the defendant fifteen bushels of wheat, but he refused to take it; and that the defendant was a close dealer. When called upon by the defendant, upon the above facts, to state his opinion, the witness answered, ' His mind is sound, so far as I am able to judge from my observations, transactions, and acquaintance with him; I think him capable of managing and controlling himself and his own affairs." The court excluded this answer, on the petitioner's motion, and the defendant excepted.

" The defendant also introduced as a witness one John B. Brown, who testified, that he had known the defendant, intimately, for twenty years, had lived within a mile and a half of him, and had repeated and frequent intercourse with him; that his daughter had sold a mule to the defendant at $75; that it was a good mule, and worth at least that much; that the defendant's deportment and behavior were good and unexceptionable; that his mind was not bright, but he was fully competent to take care of, manage and control himself and his property; and that he (witness) was neither an expert nor a physician." The court allowed the petitioner, on cross-examination,

to ask this witness the following question: "Suppose a man had ten negroes, and should sell five of them for $1300, and failed every year to make a support, and had to buy corn, meat and provisions every year, and his property wasting and diminishing every year, and he was going down hill generally, would you consider him a man of sound mind?" The defendant objected to this question, "as being illegal and irrelevant," and reserved an exception to the overruling of his objection.

"The defendant introduced as a witness one M. Robinson, one of the acting justices of the beat, who testified, that he had known the defendant for sixteen or eighteen years, and, until recently, lived within a quarter of a mile of him; that he had met him, and conversed with him frequently on various topics; that his mind was sound; that he frequently acted as bailiff, being deputed by him (witness,) and always did the business correctly, and with judgment." The court allowed the petitioner, on cross-examination of this witness, to ask him the following questions: "Was he not appointed bailiff just because no one else would have it?" "Do you not know that, if it had been a profitable business, somebody else would have had it?" "Was it not an unprofitable business in the beat?" To the allowance of each of these questions the defendant excepted.

"The defendant introduced as a witness Dr. William Taylor, who testified, that he was, and had been for six or eight years, a practicing physician; that having been requested to examine the defendant, in order to test the condition of his mind, he met and conversed with him, and noticed his general appearance and expression; but that he had formed no settled opinion as to the depth of his mind. The defendant then asked said witness, if he had discovered any evidences of unsoundness of mind; but the petitioner objected to the question, and the court sustained the objection; to which the defendant excepted." The defendant then proposed to ask the witness, "if the defendant was a lunatic," "if he was an idiot," and "if he was *non compos mentis;*" and reserved excep-

In re Carmichael.

tions to the rulings of the court in sustaining objections to said questions.

The court charged the jury, at the request of the petitioner, as follows:

"1. This proceeding is not a criminal prosecution, but is humane in its purposes, and intended to secure the protection of the defendant's property.

"2. If the jury believe from the evidence that the defendant is of unsound mind, to an extent to render him incompetent to manage his affairs, then they will find for the petitioner.

"3. Many improvident trades, made by the defendant, will authorize the jury to find him *non compos mentis.*"

The defendant excepted to each of these charges, and then requested the court to charge the jury—

"1. That the simple fact that the defendant has made an improvident trade, such as a court of equity would set aside, will not authorize them to find him *non compos mentis.*

"2. Before the jury can find a verdict which will have the effect of having a guardian appointed for the person and property of the defendant, they must be satisfied from the evidence that his mind is now in such a condition that, if it had been so from his birth, he would have been an idiot."

The court refused to give either of these charges, and the defendant excepted to their refusal.

The jury returned a verdict in these words: "We, the jury, find the defendant *non compos mentis.*" The defendant moved to set aside this verdict, and to be discharged, "on the ground that it was illegal and insufficient;" and excepted to the overruling of his motion.

All the rulings of the court to which, as above stated, exceptions were reserved, are now assigned as error.

JAS. B. MARTIN, for appellant.

L. E. PARSONS, *contra.*

STONE, J.—As this case must be reversed on several of the rulings of the court, after noticed, we will not de-

34

cide whether the verdict was sufficient. We will state, however, that, as no record is made in the probate court of the fact that the person is idiot, lunatic, or *non compos mentis*, other than that afforded by the recording of the petition and proceedings thereon, it would be the safer and more satisfactory practice to have the verdict in the very language of the statute, or its substance.—Code, § 2753; Lary v. Craig, 30 Ala. 631.

[2.] We do not subscribe to the proposition, that the term *non compos mentis* necessarily denotes a total deprivation or destruction of the intellectual powers. It denotes unsoundness of mind; not mere mental weakness, but a diseased or unhealthy mind.—Code, § 1; Rawdon v. Rawdon, 28 Ala. 567, and authorities cited; McElroy v. McElroy, 5 Ala. 83; Stewart v. Lispenard, 26 Wend. 255; Dew v. Clark, 5 Russ. 163; 1 Jarman on Wills, marg. p. 27, note 1; Stubbs v. Houston, 33 Ala. 555.

[3.] That a person makes an improvident bargain, or many improvident bargains; that he is generally unthrifty in his business, or unsuccessful in one or many enterprises, does not, *per se*, prove him to be *non compos mentis*. These may co-exist with a mind perfectly and legally sound.—1 Beck's Med. Jur. 745. Such testimony is certainly admissible, in connection with facts and circumstances tending to show mental aberration. Shrewdness in trade, and general success in business, would go far to rebut inconclusive testimony of mental unsoundness. So, improvidence and recklessness in trade would render much more satisfactory and convincing circumstantial evidence which tended to prove mental aberration.

[4.] How far, and under what circumstances, a witness who is not a physician may give his opinion on the question of sanity, is a question which has been frequently before this court.—See State v. Brinyea, 5 Ala. 241; Bowling v. Bowling, 8 Ala. 538; Roberts v. Trawick, 13 Ala. 68; Florey v. Florey, 24 Ala. 241; Powell v. The State, 25 Ala. 21; Stubbs v. Houston, 33 Ala. 555. The following principles seem to be deducible from our decisions: 1st, that a non-professional witness cannot give his opinion on the question of sanity *vel non*, except in con-

nection with the facts on which it is based; 2d, that facts, and particular acts and conduct of the person whose sanity is in issue, are competent evidence to go before the jury; 3d, that to justify the opinion of such witness, it must appear that he occupied a position toward the person alleged to be insane, which enabled him to form a correct judgment as to his mental condition.

It is not every detail of facts, which will legalize the opinions of witnesses who are not physicians. It is not enough that such witnesses have had a mere passing acquaintance, or brief occasional interviews, on general or indifferent subjects, with the one whose sanity is in question. The acquaintance should be of an intimate character—one which will enable the witness to affirm, with some confidence, that he has a knowledge of the intellectual workings and mental *status* of the party about whom he testifies; and even when this is the case, if the facts and circumstances in proof be merely indifferent or commonplace, such as are frequently witnessed in persons of similar pursuits and intelligence, the opinion of a witness based thereon, that the party was insane, should exert but little (if any) influence upon the minds of the jurors. In the cases of Powell v. The State, (25 Ala. 21,) and Stubbs v. Houston, (33 Ala. 555,) are statements of preliminary proof of acquaintance and of facts, on which we have held the opinions of non-professional witnesses were rightly admitted. In each of these cases, an intimate acquaintance was shown. So, in the case of Florey v. Florey, 24 Ala. We think the character of the preliminary proof in the two cases just above stated, will furnish a safe guide in questions of this kind; and that a less intimate acquaintance than deposed to by the first witness brought to our notice in the report of the case of Powell v. The State, should not be ruled sufficient to let in the opinions of non-professional witnesses.—Norris v. The State, 16 Ala. 776.

Under this rule, we hold, that the following witnesses laid a proper predicate for the introduction of their opinions to the jury—viz., Geo. McD. Patterson, Daniel Mc-Dearmid, Malcolm McMillan, and John B. Brown. The

record does not contain enough to show that the opinions of the following witnesses were properly received : Wayman Adair, A. D. Levi, and James H. Joiner. Thomas Smith does not sufficiently express a knowledge of Mr. Carmichael to legalize his opinion as to his sanity; but possibly, on another examination, the preliminary proof may be more full.

[5–6.] The following portions of the evidence, which were admitted against objection, should have been excluded :

The question to the witness Patterson, " whether or not Daniel Carmichael controlled defendant and his business?"

The question to McDearmid—" Is he not going down hill generally ?"

The answer of the witness McMillan, as to what Daniel Carmichael told him ;

The question to witness Joiner—" What was the defendant's appearance ? was it that of a man of sound or unsound mind ?" Also, the evidence of this witness, as to "the impression that the defendant made on his mind ? "

The question to the witness Munroe—" Did not Daniel Carmichael enjoin upon you to go with defendant, and see that he executed the process properly ?"

The testimony of the witness Malcolm McMillan, that " his mind is sound, so far as I am able to judge from my observations, transactions and acquaintance with him," seems to have been expressed with scrupulous propriety, and should have been received.

Dr. Taylor should have been allowed to express his opinion as to the soundness or unsoundness of Mr. Carmichael's mind; and should also have been allowed to state whether he had discovered any evidence of unsoundness of mind in Mr. Carmichael.—Thomas v. DeGraffenreid, 17 Ala. 602; Nelson v. Iverson, 24 Ala. 9.

The character of the questions, on cross-examination, to the witnesses Brown and Robinson, was objectionable, if the purpose of that examination was simply to bring out the facts. If the witnesses had betrayed bias, partiality or corruption, we will lay down no rule for cross-

examination.  That must be, in a great degree, left to the discretion of the presiding judge.

Several of the rulings of the probate court in the final charge, not hereinabove noticed, are obnoxious to criticism; but we will not comment on them further.

Judgment of the probate court reversed, and cause remanded.