The State v. Felter.

## THE STATE v. FELTER.

1. **Criminal law: GRAND JURY: CHALLENGE OF: ERROR WITHOUT PREJUDICE.** *Semble*, that in the exercise of a challenge to the grand jury the accused need not necessarily be personally present, and that the privilege may be exercised or waived by his attorney in the absence of the prisoner. But if this were not so, and the attorney had no power to waive the challenge in the absence of the accused, yet a judgment of conviction would not, for that reason, be reversed, when there is no showing that the grand jury were as a body illegally summoned or drawn, nor that any individual juror was disqualified; as in such case the accused, if present, could not have changed the constitution of the jury, and the error would be without prejudice.

2. —— **PETIT JURY: MAY SEPARATE DURING TRIAL OF CAPITAL CASE.** The District Court may, in its discretion, under section 2802 of the Revision, permit the jury in the trial of a capital case, to separate, under the admonition of the court as required by section 2803, at the various adjournments of the court during the trial, and prior to the final submission of the cause to them, although the prisoner at the time objects to such separation. The discretion confided to the court by the statute would, however, in such case, be more safely exercised in granting than in denying the request of the defendant.

3. —— **MURDER: EVIDENCE OF INSANITY: MEDICAL WITNESSES.** In a trial for murder, where the defense set up is insanity, medical witnesses who have no personal knowledge of the prisoner cannot be

The State v. Felter.

allowed to state an opinion formed from the testimony in the case and the defendant's conduct on the trial, as to his sanity or insanity at the commission of the act. This would practically put such witnesses in the place of the jury.

4. —— PRIOR INSANITY MAY BE SHOWN. But it is competent to show that the defendant has been insane at a prior period of his life; and a physician who visited him at such time, and from actual examination or observation became acquainted with his mental condition, may state to the jury an opinion as to his sanity or insanity at the time when he thus observed or examined him. So, too, it is competent to show, as properly bearing on the question of the defendant's alleged mental derangement, that his father was also subject to insanity.

5. —— TEST OF CRIMINAL RESPONSIBILITY. The capacity to distinguish right and wrong is not, in all cases, a safe test of criminal responsibility. If a person commit a homicide, knowing it to be wrong, but driven to it by an uncontrollable and irresistible impulse, arising not from natural passion, but from an insane condition of the mind, he is not criminally responsible.

6. —— HOW THE JURY SHOULD BE INSTRUCTED. In such a case, the jury should be told that if the defendant's act was caused by mental disease or unsoundness, which dethroned his reason and judgment with respect to that act, which destroyed his power rationally to comprehend the nature and consequences of it, and which, overpowering his will, irresistibly forced him to its commission, then he is not amenable to legal punishment. But that if they believe from all the evidence and the circumstances, that the defendant was in the possession of a rational intellect, a sound mind, and allowed his passions to escape control, then, though passion may for the time being have driven reason from her seat, and usurped it, and have urged the defendant, with a force at the moment irresistible, to desperate acts, he cannot claim for such acts the protection of insanity.

*Appeal from Benton District Court.*

TUESDAY, JUNE 9.

GRAND JURY : SEPARATION OF TRIAL JURY : INSANITY, ETC. The defendant was indicted for the murder of his wife, pleaded not guilty, was tried, found guilty of murder in

the second degree, and sentenced to imprisonment in the penitentiary of the State for life. From this judgment he appeals to this court.

The errors assigned, and the facts upon which they rest, are stated in the opinion of the court.

*J. H. Murphy & Bro., I. M. Preston & Son,* for the appellant.

*Henry O'Connor,* Attorney-General, for the State.

DILLON, Ch. J.— I. The defendant first complains of the action of the court in overruling his motion to set

1. CRIMINAL LAW: grand jury: challenge of: error without prejudice.

aside the indictment. This motion is based upon an alleged denial to the defendant of the right to challenge the grand jury or any individual juror. Rev. § 4611. The record recites the following proceedings had : "Upon the impaneling of the grand jury, in relation to the defendant, a prisoner in custody on a charge of murder, to wit: And thereupon each of said grand jurors was inquired of as to having formed or expressed an opinion as to the guilt or innocence of the defendant of the crime charged, and each answered that he had not; and the said defendant also appeared by J. H. Murphy and I. M. Preston his attorneys, and waived any objection to said grand jury."

This motion was not made until after the defendant had procured a change of venue to another county, on account of the prejudice of the inhabitants against him, and was made in the District Court of the latter county.

It was not accompanied by any showing that the grand jury which found the bill "were not appointed, drawn or summoned as prescribed by law" (Rev. § 4612); nor by any showing that the individual grand jurors were subject to any of the objections specified in section 4613 of the Revision.

The privilege given to the accused to challenge the grand jury is statutory, and the challenge must be for certain specified causes only. It is our opinion that he need not, unless it is insisted upon by or for him, necessarily be personally present when this privilege is being exercised, but may exercise it or waive it by attorney.

Hence there was no error in the action of the court refusing to set aside the indictment. This opinion is based upon the following reasons : This proceeding is no part of the *trial*, and the statute does not in terms require the presence of the defendant. The common law rule as to the personal presence of the accused at the *trial*, the rendition of the verdict, etc., has no necessary application to this special statutory privilege.

Again, the Code of Criminal Practice is specific in stating *when* and in *what cases* the defendant must be personally present. As to *arraignment*, see section 4681 ; *trial*, section 4706 ; *verdict*, section 4826 ; and *judgment*, section 4863.

It is silent as to the necessity of defendant's actual presence during the impaneling of the grand jury ; hence arises the inference that the legislature did not intend to make the personal presence of the accused at this preliminary proceeding absolutely essential, any more than when a plea is filed (ch. 203), or a motion (ch. 202) or a demurrer argued (ch. 205). But, if it be admitted that this view is erroneous, and that the defendant, being charged with felony, should be personally present when the grand jury is being constituted,—still we could not for this ground, under the circumstances of the present case, reverse the judgment.

There was, as above stated, no showing that the grand jury as a body was illegally drawn or summoned, and no showing that any individual juror was disqualified to act. This being so, the defendant, if present, could not

have changed the constitution of the grand jury if he had desired to do so; for the statute gives him no right to peremptory challenges to the grand jury.

The alleged error of the court in forming the grand jury, in the absence of the defendant, if error, was without prejudice to "the substantial rights" of the defendant. (Rev. § 4925.)

This is consistent with the proposition, that, if the record showed affirmatively that the defendant was not present in person at the trial, the verdict or the judgment, we would reverse, although no prejudice were affirmatively shown.

Courts do not favor objections based upon irregularities respecting preliminary matters and proceedings, while they will sedulously guard all rights secured to the accused while undergoing the ordeal of a *trial* which is to be decisive of issues so momentous and weighty alike to the defendant and to the State.

II. The next error assigned is the action of the court in permitting the trial jury to separate at the various 2. —— petit adjournments of the court during the trial, jury: may separate dur- and prior to the final submission of the cause ing trial of capital case. to them. The statute plainly allows this course to be pursued, "in the discretion of the court." (Rev. § 4802.) The defendant, it is true, objected to the separation, but he shows no facts which make it appear that the court abused the discretionary power over this matter, which the statute confides to it. The record states that the court duly admonished the jury, as required by section 4803 of the Revision.

In thus holding, that, under the statute, there was no error in permitting the jury to separate, we feel constrained to observe that the common law reasons for disallowing this to be done are of great force, particularly in capital cases and the graver felonies which excite

public interest. And where a defendant, who is on trial for his life, or for some high offense, asks that the jury during the trial be kept together in charge of the proper officers, the discretion of the court is, we feel bound to say, better — at least more safely — exercised in granting, than in denying, the request.

III. The next error assigned relates to the action of the court in excluding from the jury certain portions of the affidavit made by the defendant for a continu-ance. Upon the affidavit being made, the district attorney, according to the record, "to avoid a continuance admitted, that the witnesses named in said affidavit would swear to the facts therein stated as facts expected to be proven by them; but, by agreement of parties, the defendant being present and assenting thereto, the State, on the trial, or before, was to have the right to object to the whole or any part of the affidavit for insufficiency, irrelevancy or incompetency."

3. —— murder: evidence of in-sanity: medi-cal witnesses.

On the trial, the court, on the objection of the State made pursuant to the above stipulation, excluded certain portions of the affidavit, to which the defendant excepted, and assigns its action as error.

It is first urged, that the court excluded the testimony of the defendant's brothers, who were acquainted with him in former years and who would testify to facts show-ing the defendant to have been at times insane at that period of his life, about sixteen years ago. This portion of the affidavit, though underscored in red ink, is not marked on the margin as having been stricken out by the court, and it is not entirely certain that it was excluded from the jury.

We fully agree with defendant's counsel that on a ques-tion of insanity it is competent to show that the defendant had been insane at a prior period of his life. The testi-mony of Dr. Hale is not marked excluded on the margin.

It is true a portion of it is underscored in red ink, but although the question is left in some doubt, we can not infer from thence that this portion was rejected by the court. Another objection consists in the rejection of that portion of the affidavit relating to the proposed testimony of Dr. Hughes of the Keokuk Medical College, Dr. Ranney of the Insane Asylum, and Dr. Staples of the U. S. Army, each of whom is stated to have had large experience in the treatment of insanity. The affidavit then states that from the foregoing facts and circumstances respecting the mental derangement of the defendant (viz., those expected to be proved by other witnesses), and from the circumstances connected with the alleged homicide and defendant's acts and conduct on the trial, in their opinion the defendant at the time of the alleged homicide was in a deranged state that would render him unconscious of what transpired.

At first it seemed to us that in excluding this portion of the affidavit from the jury, the court erred. But upon a closer examination we are of opinion that its action may, under the statute, and the peculiar character of the affidavit, be sustained.

The statute requires "particular facts, as distinguished from legal conclusions," to be stated. §§ 3010, 3011, 4750.

If the "court finds the statement of facts sufficient, the cause shall be continued, unless the opposite party will admit that the witness, if present, would swear to the facts thus stated; in which event, the cause shall not be continued, but the party moving therefor shall read, as the evidence of such witness, the facts held by the court to be sufficiently stated." § 3013.

The parties stipulated that all proper objections to the sufficiency of the affidavit might be made on the trial.

It will be seen that it was proposed to prove by the three medical gentlemen named, that in their opinion

the defendant was insane at the time the homicide was committed.

The affidavit undertakes to give the data upon which this opinion is based. If the data thus given will not, in law, entitle the medical gentlemen to give to the jury an opinion as to the defendant's sanity, then, strictly, there was no error in excluding such opinion from the jury.

If those medical men had been present upon the witness stand, and had been asked, "From the facts and circumstances stated by previous witnesses, and from those testified to by still other witnesses, relating to the homicide, and from defendant's conduct on the trial, is it your opinion that the defendant was sane or insane when he committed the act?"—such a question would have been incompetent, for it practically puts the medical witnesses in the place of the jury. *Pelamourges* v. *Clark,* 9 Iowa, 1, 16 ; 3 Greenl. Ev. § 5.

Viewing the question arising on this portion of the affidavit as one of law purely, we are not prepared to hold that we would, for the reason alone that this part of the affidavit was excluded, reverse the judgment.

But the action of the court in striking out another portion of the affidavit, and in excluding the same from the jury, was manifestly erroneous. We refer to that part relating to the testimony of Dr. Fay.

4.——prior insanity may be shown.

This was as follows : "Affiant expects to prove by Dr. Z. Fay, who resides in Albany county, N. Y., that he was the family physician of the defendant's father while the defendant lived at home ; that he has visited the defendant while defendant was laboring under the mental disability above set forth ; that said Fay is a practicing physician, and that in his opinion the defendant was, while laboring under the mental disability above set forth (viz., that specified in previous portions of the affidavit), mentally deranged, and unconscious of what transpired

around him, and, from his knowledge of the defendant, and of his father's family, he believes that the defendant is subject to mental derangement and temporary insanity."

If the defendant has been insane at former periods of his life, it is undeniable that this is a fact proper to be shown to the jury trying the question of his criminal capacity.

And it is equally undeniable, that, if a physician visits a person, and, from actual examination or observation, becomes acquainted with his mental condition, he may give an opinion respecting such mental condition at that time—that is, he may, under such circumstances, state to the jury his opinion as to the sanity or insanity of the person at the time when he thus observed or examined him. In re Carmichael, 36 Ala. 514; 1 Bish. Cr. Pro. § 541; Commonwealth v. Rodgers, 7 Metc. 500; Clark v. The State, 12 Ohio, 483; Baxter v. Abbott, 7 Gray, 71; McAllister v. The State, 17 Ala. 434; In re Vanauken, 2 Stock. 186; 1 Greenl. Ev. § 440; Heald v. Thing, 45 Me. 392.

There is no more reason why he may not do this, than why he might not testify that he saw a certain person at a certain time, and that he was then laboring under an epileptic fit, or under an attack of typhus fever, or had been stricken down and rendered unconscious by an apoplectic stroke.

We have found it impossible to sustain the ruling of the court in rejecting this portion of the affidavit. Of its materiality it is needless to speak. The point decided is, that a medical witness may, from personal knowledge and examination, give an opinion based thereon, as to the mental condition of such person. He might, of course, be required on cross-examination to describe the condition of the person, and to give the data and facts upon which his opinion is based. For this error, the judgment

must be reversed.   This result we regret the less, because there is much in the record to show (though not sufficient on this account alone to justify a reversal), that all that portion of the affidavit before referred to as being underscored with red ink, and which stated that defendant's father and the defendant himself were subject to insanity, were stricken out by the court before the affidavit was read to the jury; and because, also, we are not satisfied that there was that full, thorough and deliberate examination of the defendant's alleged insanity to which he was, under the law, entitled.

We cannot resist the conclusion, that the defendant, by the rulings of the court below, was practically deprived of showing to the jury the truth of the alleged insanity of his father and of himself at former periods of his life; facts competent, material and highly important as bearing upon the question of the defendant's alleged insanity. *Baxter* v. *Abbott*, 7 Gray, 71.

In the debate in the House of Lords on *McNaughton's case*, Lord Brougham very justly criticised the needless haste of the court in *Bellingham's case*, in proceeding to trial without allowing the prisoner the opportunity of showing that his family had been tainted with insanity and that he himself had been previously insane. Hansard, 67, 714.

IV. Finally, it is insisted that the court erred in its instructions to the jury, and in its refusal to give certain instructions prayed by the defendant relative to the defense of insanity.   Before noticing the assignment of error, it is proper, briefly, to refer to the circumstances of the homicide.   That the defendant took the life of his wife, was not disputed; and the only defense made or relied on was that species of mental unsoundness which has received the name of homicidal mania.

The testimony tends to show that the defendant was

about forty years of age, and resided with his wife and a child (who was a witness on the trial), in Tama county, on a farm, about one mile distant from neighbors. He had resided in that county for over ten years, and had served in the army during the war. He had, during the forenoon of the day on which the homicide was committed, been at work in the usual manner. Shortly after dinner the neighbors, from seeing the fire, or some other reason, visited the premises of the defendant, and found the house in ashes, and the defendant's wife within a few feet of it, dead, without clothing upon her person, one of her feet burned off, her features so destroyed by fire that they could not be recognized, and her skull badly fractured, evidently in consequence of heavy blows with a club or other deadly instrument. The defendant himself, was found (although he had been seen walking around by persons when approaching the premises) lying near some stacks a few rods from the dwelling-house, with his throat cut from ear to ear, and very weak from the loss of blood. His hair and whiskers were singed, and there was a blister on his nose, but no evidence of fire on any other part of his person, and his clothes were not burned.

There was but one eye-witness to the terrible occurrence — a very young daughter of the defendant, whose age is not stated in the record; and she saw only the first portion of it. The testimony in the case is very imperfectly reported, having been taken down by an unskilled person. The daughter testified, in substance, thus:

"My mother is dead — my father killed her; he struck her — I don't know with what; he was mad at her before I left; it was because she poured the buttermilk out; I left because he was going to kill me; I knew this by the way he acted; mother told me to go to Mr. P.'s (a neighbor's); it was in front of the house that father struck her, about a rod from the house; he shot the gun off by her

head; my father was cross to her and did every thing mean he could." She then narrates a quarrel occurring some months before between the defendant and his wife about a dog, and a threat of the defendant to her, that if she did not let him alone, he would stop her breath or the dog's. "Mother said nothing to me when I left, as to what the defendant was going to do; when I went to Mr. P.'s, she said she was afraid he (defendant) would kill us; my father, at this time, was breaking things in the house; when I started to Mr. P.'s they were out between the house and fence; we had all eaten dinner — all sat down to dinner together, nothing was said; I started to Mr. P.'s because his actions were such, that I thought he was going to kill me; I went into the house and he was breaking things; he said nothing; he threw the lamp out of doors, and broke the clock; said nothing when he did this; papa and I were in the house, and ma out, when I started to Mr. P.'s; I saw father strike mother; I was then two or three rods off; I do not know with what, or how many times he struck her; after he went out he had the gun; the end of the gun was past mother when he fired it off; my mother said she was going to tell uncle Jacqua what he had done; he broke the clock and threw water on her; it made him madder than he was; this was after the clock and lamp were broken; he shot the gun off first, and then struck her, and they both fell, and mother was trying to get away from him; she did not halloo."

There was other evidence, showing that they did not at times live happily together, and that the defendant was fault-finding and cross toward her. The physician who examined the deceased, gave it as his opinion, that the blow upon her skull would produce instant death. When Doctor Daniels afterward dressed the defendant's wound in his throat, he had a conversation with him in respect to the homicide. The defendant said, "that the reason

he shot at her was, that he wanted to scare her. He said he wanted to destroy every thing, so that she would not get any thing, and this was the reason why he burned the house. I asked him why he struck his wife. He said he did not strike her; that the last he saw of her, she was going toward Buckingham's." The doctor asked the defendant if he was not sorry that things were not as they were in the morning; to which he replied "I do not know as I am." On the next day after the fatal occurrence he told another witness the difficulty about the buttermilk, and said his wife "struck him in the face with a plate; that she went on throwing things out of the house; he told her to stop; she threatened to report him to the trustees; he then, he said, took down his gun and shot at her; did not intend to kill her; that he was so mad that his passion got the better of him, and about what happened after that he had nothing to say. I asked him if he intended to kill the little girl if he caught her. He replied he did not intend to hurt her." This conversation took place at the instance of the defendant, who asked a person present to go out of the room so that he could talk with the witness.

A great number of witnesses who had known the defendant for many years, testified that they never saw any thing strange in his conduct, or any thing to lead them to suspect that he was of unsound mind.

The defendant stated that he cut his throat with a razor, and told where it could be found. There was testimony tending to show, or from which it might be inferred, that the defendant had tried to rescue his wife from the flames. That is, it was testified by the physicians that the blow upon her head would kill her instantly, and it would seem that after the blow was dealt she was removed by the defendant from the house, after she had been burned in the manner before described. There was

also testimony from which it might be inferred that the defendant cut his own throat before he left the burning dwelling. It was admitted by the State that the defendant intended to take his own life when he cut his own throat. There were no witnesses upon the stand who knew of or testified respecting the alleged insanity of the defendant when at home, or the alleged insanity of his father.

The medical witnesses examined on the trial, as not unfrequently happens, differed in opinion as to the defendant's sanity. Most of these witnesses, however, had given to the subject of insanity no special attention.

The court charged the jury that "if the defendant, at the time of the commission of the act (if he did commit it), was laboring under such a degree of insanity as irresistibly and uncontrollably forced him to commit the act, and if he did not at the time of the act, have reason sufficient to discriminate between right and wrong in reference to the act about to be committed by him, it is your duty to acquit wholly; in other words, if you believe from the evidence that the defendant's mind, at the time of committing the act (if he did commit it), was so insane that he did not know the nature of the crime, and did not know that *he was doing wrong in doing the act*, it is your duty to acquit him altogether."

*The test of criminal responsibility.*

The defendant's counsel complain of this instruction, and in their written argument make to it this objection: "The court did not state the law; only a part of it. It told the jury if the defendant had sufficient mind to discriminate between right and wrong he was responsible. This is not sufficient. He must have mind enough to know that he will be held responsible for his act."

The specified objection to this instruction does not call upon us to enter at length on an examination of the subject of insanity as a defense to alleged criminal acts. The instructions as given are substantially as the defend-

ant's counsel in their argument claim they should have been, and are not, as we find upon comparison, essentially different on this point from those asked to be given on the part of the defendant.

With reference to the right and wrong test referred to in the instructions given, it will be seen that the court does not adopt this criterion as a general one, that is the court does not say if the defendant has capacity to distinguish between right and wrong generally, he is criminally responsible.

But it held that if at the time and with respect to the *act* about to be committed, the defendant had not reason enough to discriminate between right and wrong with reference to that act, had not reason enough to know the nature of the crime, and did not *know that he was doing wrong in committing it,* he is not criminally punishable. The court in substance held that if the defendant's reason was so far gone or overwhelmed that his perception of right or wrong with respect to. the contemplated act was destroyed, if he did not rationally comprehend the character of the act he was about to commit, he should be acquitted.

The instruction as given finds a full support in the judgments of courts the most respectable. *Freeman* v. *The People,* 4 Denio, 27; and approved and followed in the recent case of *Willis* v. *The People,* 32 N. Y. 715; *The State* v. *Brandon,* 8 Jones (N. C. Law), 463; *Mosler* v. *Commonwealth,* 4 Barr. 266; *McNaughton's Case,* 10 Cl. & F. 210; *Oxford's Case,* 9 C. & P. 525.

On the other hand, the right and wrong test, even when guarded as carefully as in the court's instruction, has been very vehemently opposed as incorrect and delusive (Ray, §§ 16, 17, 18, 19, *et. seq.;* Wharton & Stille [2d ed.] § 59; and see *Smith* v. *Commonwealth,* 6 Duvall [Ky.] 224), especially as a criterion of responsibility in cases of moral insanity.

As applied to the facts of this case, a preferable mode of instructing the jury will be briefly indicated below.

In my opinion, the right and wrong test is not to be applied too strictly, and belongs more properly to intellectual than to moral insanity. Intelligent medical observers who have made insanity a special study, insist that it not unfrequently happens that persons undoubtedly insane, and who are confined on that account in asylums, are able to distinguish right from wrong, and to know the moral qualities of acts.

Perhaps the profession of law has not fully kept pace with that of medicine on the subject of insanity. And yet medical theorists have propounded doctrines respecting insanity as an excuse for criminal acts, which a due regard for the safety of community and an enlightened public policy must prevent jurists from adopting as part of the law of the land.

If, as the court charged, the defendant committed the act from an irresistible and uncontrollable insane impulse, not knowing it was wrong, it is clear that he is not criminally responsible.

But suppose he knew it was wrong, but yet was driven to it by an uncontrollable and irresistible impulse, arising, not from natural passion, but from an insane condition of the mind, would he then be criminally responsible?

Most of the cases before cited have recognized the doctrine, that there is a responsibility for the criminal act if the accused knew at the time it was wrong; or, as it would be better expressed, if he rationally comprehended the character and consequences of the act.

But, if, from the observation and concurrent testimony of medical men who make the study of insanity a specialty, it shall be definitely established to be true, that there is an unsound condition of the mind, — that is, a

diseased condition of the mind, in which, though a person abstractly knows that a given act is wrong, he is yet, by an *insane impulse*, that is, an impulse proceeding from a diseased intellect, irresistibly driven to commit it,— the law must modify its ancient doctrines and recognize the truth, and give to this condition, when it is satisfactorily shown to exist, its exculpatory effect.

It is not too much to say, that both medicine and law now recognize the existence of such a mental disease as homicidal insanity; the remaining question in jurisprudence being what must be shown to make it available as a defense to a charge of murder. See Wharton & Stille's Med. Juris. §§ 61, 178.

In a recent case in Kentucky, it is said that moral insanity is recognized by medico-jurists, and that " the true test of responsibility is, whether the accused had sufficient reason to know right from wrong, and whether or not he had sufficient power of control to govern his actions." *Smith* v. *Commonwealth*, 1 Duval (Ky.) 224; see also *Scott* v. *Commonwealth*, 4 Metc. (Ky.) 227; compare *State* v. *Brandon*, *supra*.

If this want of power of control arose from the *insane* condition of the mind of the accused, he should not be held responsible. But if want of power to control his actions arose from violent and ungovernable passions, in a mind not diseased or unsound, he would and ought to be criminally punishable for his acts.

Of all medico-legal questions, those connected with insanity are the most difficult and perplexing.

Without further discussion, we conclude by stating what, under the facts of this case, would be safe and 6. —— how the proper directions to be given to the jury respecting the point under consideration. The jury, in substance, should be told that if the defendant's act in taking the life of his wife (if he did take it), was

*(margin note: 6. —— how the jury should be instructed.)*

caused by mental disease or unsoundness, which dethroned his reason and judgment with respect to that act, which destroyed his power rationally to comprehend the nature and consequences of that act, and which, overpowering his will, irresistibly forced him to its commission, then he is not amenable to legal punishment. But if the jury believe from all the evidence and circumstances, that the defendant was in the possession of a rational intellect or sound mind, and allowed his passions to escape control, then, though *passion* may for the time being have driven *reason* from her seat and usurped it, and have urged the defendant with a force at the moment irresistible to desperate acts, he cannot claim for such acts the protection of insanity.

Whether *passion* or *insanity* was the ruling force and controlling agency which led to the homicide, — in other words, whether the defendant's act was the insane act of an unsound mind, or the outburst of violent, reckless and uncontrolled passion in a mind not diseased, — is the practical question which the jury should be told to determine according to their best judgment upon the evidence before them. If they believe that the homicide was the direct result or offspring of *insanity*, they should acquit; if of *passion*, unless it be an insane passion, they should convict. This is a much more practical inquiry than to direct their attention solely to the defendant's capacity at the time to distinguish right from wrong — an inquiry which must often be speculative and difficult of determination from the data possible to be laid before the jury, and which as a test or criterion of responsibility rather belongs, when applicable, to what is known as *intellectual*, as distinguished from *moral* insanity.

As the case will have to be retried, we have briefly indicated our general views as to the instructions proper to be given to the jury on the subject of criminal

capacity and responsibility. Where homicidal insanity is relied on, the court may very properly say to the jury that they should indulge in no prejudice against the defense, but give it thoughtful, thorough, dispassionate consideration; yet that the interest of society requires that it ought not to be regarded as sufficient to exculpate unless the jury believe from the evidence that the propensity to commit the act existed in such violence as to subjugate the intellect, control the will and render it impossible for the accused to do otherwise than to yield to the insane impulse. In other words, it should appear not only that the mind of the accused was insane, but that the act for which he is indicted was the direct offspring of such insanity; this being shown, responsibility is annulled, but not otherwise. Because of the error of the court in excluding material portions of the affidavit for a continuance, the judgment is reversed, and the cause remanded for a new trial.

Reversed.

NOTE.—The reporter has learned that on a subsequent trial the hereditary insanity was not shown, and the defendant was convicted of manslaughter.