## THE STATE v. MEWHERTER.

1. **Criminal Law:** AFFIDAVITS OF GRAND JURORS. The affidavits of grand jurors to the effect that they did not consent to the finding of an indictment are not admissible in support of a motion to quash.

2. **Practice:** CHANGE OF VENUE. The granting of a change of venue rests within the discretion of the court, and his action will not be reviewed unless an abuse of discretion is shown.

3. ———: ———: PREJUDICE OF JUDGE. Affidavits showing the prejudice of the judge, if admissible at all, must state facts and not the opinions and belief of affiants. As to the admissibility of such affidavits, *quære*.

4. **Evidence:** ATTORNEY: PRIVILEGED COMMUNICATION. Communications made to an attorney in the course of a professional consultation, which do not relate to the subject matter of the consultation, are not privileged.

5. **Criminal Law:** INSANITY: UNCONTROLLABLE PROPENSITY. The uncontrollable propensity which will relieve a person from the consequences of the commission of a crime, must have its origin alone in a diseased or insane mind.

6. ———: ———. To entitle one who has committed a criminal act to an acquittal on the ground of insanity, his mental disease must have been such as to destroy the power to comprehend rationally the nature and consequences of his act, and overpower his will.

7. ———: ———: DELUSION. One who commits a crime under the influence of an insane delusion is punishable if he knew at the time that he was acting contrary to law.

8. ———: ———: ———. In a case of partial delusion, where the subject is not insane in other respects, the law considers him, as to his responsibility, in the same condition as if the facts in regard to which his delusion exists were real.

9. ———: ———: INSTRUCTION. Upon the trial of one accused of a crime wherein the defense is insanity, the jury may properly be directed in considering the question of the sanity of the accused, to consider his appearance, conduct and language prior to the time of the commission of the alleged crime.

10. ———: CONVICTION IN LOWER DEGREE. A verdict of murder in the second degree may be found where death is not intended by the accused.

*Appeal from Pottawattamie District Court.*

WEDNESDAY, JUNE 6.

THE defendant was indicted for murder in the first degree in killing Joseph W. Hatton, in Pottawattamie county, and,

upon conviction for the crime, was sentenced to imprisonment in the penitentiary for life. He now appeals to this court. The facts of the case are found in the opinion.

*Montgomery & Scott*, for appellants.

*J. F. McJunkin*, Attorney General, *John H. Keatley*, and *C. E. Richards*, for the State.

BECK, J.—The numerous objections urged to the proceeding and the rulings of the District Court may be more conveniently considered in the order chosen by counsel for defendant in their presentation. The facts of the case will be presented as their consideration may be necessary, in the discussion of the questions we shall be called upon to decide.

I. The defendant moved the court to quash the indictment for the following reasons: 1. It was never submitted to, voted upon or agreed to by the grand jurors. 2. It was fraudulently prepared, signed, indorsed and presented to the court by the district attorney and foreman of the grand jury. 3. The grand jurors never agreed to an indictment charging defendant with murder. The grounds of the motion number seven; they are covered by the three as stated above. The motion was supported by the affidavit of three members of the grand jury, and it may be conceded the facts upon which the objections to the indictment are based are shown therein.

1. CRIMINAL law: affidavits of grand jurors.

Ten of the grand jurors unite in an affidavit, contradictory of the statements of their fellow jurors, showing that there was no fraud, irregularity or violation of law in the finding and presentment of the indictment. The district attorney, by affidavit, makes a like statement. The motion was properly overruled. This court has held that affidavits of grand jurors, to the effect that they did not assent to the finding of an indictment, are not admissible in support of a motion to set it aside. *The State v. Gibbs*, 39 Iowa, 318. The grand jurors cannot he heard to deny that they assented to the indictment in the form it is presented. The charge of fraud and irregularity in presenting the indictment, if it be proper to support

it by the affidavits of the grand jurors, which we need not determine, was denied and overcome by the affidavit of ten of the panel, and a similar statement made under oath by the district attorney. The court was clearly authorized to find that the charge was not based upon facts.

II. A motion for a change of venue to some other judical district, on the ground of the alleged prejudice of the judge,

2. PRACTICE: change of venue. was overruled. It was based upon the affidavit of the prisoner, alleging that he could not receive a fair and impartial trial on account of the prejudice of the judge before whom the cause was pending. Defendant's counsel and six residents of the county, three of the latter were the members of the grand jury whose affidavits as to irregularity in presenting the indictment were filed, as stated above, supported the application by affidavits to the effect that they believed the judge was so prejudiced against the prisoner that he could not have a fair and impartial trial. No grounds were stated in these affidavits for the belief expressed, and no facts are recited, if any existed, showing or tending to show the prejudice existing in the mind of the judge as charged against him.

The provisions of the Code applicable to the questions arising upon the action of the court in denying the application for a change of venue, which is assigned as error by the prisoner, are as follows:

"Section 4368. In all criminal cases which may be pending in any of the District Courts of this State, any defendant may petition the court for a change of venue to another county.

"Section 4369. Such petition must set forth the nature of the prosecution, the court where the same is pending, and that such defendant cannot receive a fair and impartial trial owing to the prejudice of the judge, or to excitement or prejudice against him in such county, and must verify the same by his affidavit stating the same to be true as he verily believes.

"Section 4370. When the ground alleged in the petition is excitement and prejudice against him in the county, it must be verified by three disinterested persons, residents of the

county from which the change is sought, in addition to the petitioner himself.

"Section 4371. The petition need not state the facts upon which the belief of the petitioner or other person verifying the same is founded, but may allege the belief of the particular ground thereof in general terms.

"Section 4372. The court may receive additional testimony, by affidavits only, either on the part of the defendant or the State, when the alleged ground in the petition is excitement and prejudice in the county against the petitioner."

"Section 4374. The court, in the exercise of a sound discretion, must decide the matter of the petition, when fully advised, according to the very right of it."

It will be observed that the requirements of the provisions applicable to the two cases, in which a change of venue is allowable, differ. When the change is sought on account of the prejudice of the people of the county, the petition must be verified by three disinterested residents of the county; additional testimony, also, may be received by the court upon the allegations of the petition. When the petition charges the judge with prejudice, it is not supported by the verification or testimony of witnesses. The court acts upon it alone. An application based upon either ground recognized by the statute is to be determined in the exercise of a sound judicial discretion.

In a case wherein the change of venue is sought upon the ground of the prejudice of the judge, it cannot be claimed that the application must be granted as a matter of course, without the court passing upon the merits and determining the existence of the cause upon which it is grounded. The court is required to exercise a judicial discretion in deciding upon the matter of the petition. This discretion is applied in determining the facts as well as the law of the case. We cannot disturb decisions of inferior courts made in the exercise of legal discretion, unless it be made to appear to us that such discretion has been abused — unlawfully exercised. In the case before us there is nothing tending to show illegal action by the court upon defendant's petition for a change of venue. No fact is brought to our attention establishing the existence of

prejudice in the mind of the judge. The petition alleges prejudice without showing facts upon which such allegation is based. In this it conforms to the statute. The witnesses verifying the petition state their belief of the existence of the prejudice, but no facts upon which such belief is based. The verification of the petition in this way is not in conformity with the statute. As the affidavit of the witnesses states no fact — simply the belief of affiants — it cannot be regarded as the ground of judicial action. We, therefore, repeat that we have nothing before us to justify the conclusion that the decision of the court below in overruling the petition was not a proper and lawful exercise of the judicial discretion with which the judge is clothed by the statute.

We do not find it necessary to decide whether affidavits, in cases of this kind, may be admitted to show the prejudice of 3. —: —: the judge. If admissible at all, they must show prejudice of judge. facts, not opinions and belief. As no such proof was introduced in the court below, it is not for us now to determine its admissibility in a proper case.

III. At the trial a witness, Austin, was introduced on behalf of the State, and to the introduction of his testimony objection was made by the defendant on the ground that his name was not indorsed upon the indictment, as required by statute, and he was not examined before the grand jury. Code, §§ 4293, 4421. The statute provides in such cases that, to authorize the admission of the testimony of such witness, the district attorney shall give to the defendant a "notice in writing, stating the name, place of residence, and occupation of such witness and the substance of what he expects to prove by him on the trial, at least four days before the commencement of such trial." Upon the motion of defendant to exclude the testimony of Austin it was shown that such a notice had been given, which stated that the witness resided in Pottawattamie county. His real place of residence, however, was found to be in Montgomery county. The court admitted his evidence, and this action is made the ground of an objection urged in this court.

It does not become necessary to determine whether the

incorrect statement of the place of residence of the witness rendered the notice insufficient, as the error, if there be any, in the admission of his testimony, was without prejudice to the defendant. The witness testified to no facts except the position, distance and direction from each other of certain houses and objects, at and near the locality where the homicide was committed. The character of the country at the place, and the course of the roads were explained by the witness. These facts were stated by other witnesses, or were in no manner disputed by the witnesses of defendant, or brought in question on the trial. Indeed, they were entirely consistent with the testimony as developed by the defense. Had the testimony been rejected the verdict could not have been different. It clearly appears that the evidence, by no possibility, wrought injury to defendant. We cannot, therefore, if we admit it to be incompetent, disturb the judgment because of the introduction of the testimony. Code, § 4538.

IV. A witness for the State testified as follows: " I saw defendant in the office of Montgomery & Scott. I am a member of the bar and was at that time. * * * Was working as an attorney-at-law for Messrs. Montgomery & Scott at that time. My duties were those of an attorney and lawyer at the time in that office. Had been so engaged therein about five months. I was working in the office in our business on a salary. He (defendant) was a client of ours at that time; was consulting with us about a suit with Dr. Hatton [the killing of whom is charged in the indictment against defendant] for malpractice. Defendant came in and consulted about his suit with decedent. What he said was during such counsel and in course of consultation." The State then interrogated the witness upon the subject of threats made at that time and place against the life of deceased. The counsel of the defendant objected to the testimony sought to be elicited, on the ground that it would expose communications made by defendant as a client to his counsel, which were privileged and not the subject of lawful communication by the attorney. The objection was overruled and the witness was permitted to answer, stating that defendant did at the time threaten the life of Dr. Hatton.

The admission of this testimony is assigned as error and made a ground of objection to the judgment of the court in the argument of counsel.

It may be conceded that the relation of attorney and client existed between the witness and defendant, and that the threats were made by defendant, which were the subject of the testimony objected to, during a communication with the witness in his professional capacity upon a subject concerning which his advice or the advice of his firm was sought. But it very clearly appears that the threats in no manner pertained to the business of the professional consultation; they had nothing to do with the litigation or contemplated litigation about which the advice and assistance of the attorneys were solicited. It cannot be claimed, even, that the intention expressed by the threats was a matter submitted to the attorneys professionally. Their advice and aid were not sought in regard to it. The defendant's enmity, spirit of revenge, or other motive, whatever it may have been, which prompted the threats had no connection with the matter involving the rights of defendant submitted to the attorneys. Neither the threats nor the motives of defendant were the subject of professional communication. They cannot therefore be regarded as privileged. 1 Greenleaf's Ev., § 140; *Pierson v. Steortz,* Morris, 136; Code, § 3643.

We need not consider the threats in the view of their unlawfulness, as depriving them of the character of a privileged communication. The ruling of the District Court is sufficiently supported upon the grounds above stated.

V. A witness for the State, who had testified, upon the direct examination, that he saw the defendant, about the time of the homicide, with a gun in his hands, was asked upon the cross examination if he did not know, as a matter of fact, that the defendant was in the habit of carrying his gun for the purpose of guarding his sheep that were pasturing near the place, and that he had used the gun to kill dogs that had worried his flock. The question was objected to by the district attorney as not proper upon cross examination and was not allowed by the court. This ruling is complained of by

defendant's counsel. We discover no grounds for holding that it was made in the absence of the discretion of the court lawfully exercised in controlling the cross examination of witnesses. But should we conclude the ruling was erroneous we are clear that no prejudice resulted to defendant. The fact proposed to be elicited by this question was established in the course of the examination by more than one witness and no attempt was made to contradict it.

VI. Testimony tending to prove the insanity of the defendant at the time of the homicide was introduced in his behalf. It was claimed that this condition of mind had existed for some time. A witness for the State testified that during the time of the alleged insanity he had two conversations with defendant and saw him often, but observed nothing unusual in his actions, and that, in the language of the witness, "so far as I could see, he was as regular and sane as the first day I saw him." Upon the cross examination, the counsel for defendant asked the witness if he thought himself competent to give an opinion as to defendant's sanity. An objection to the question was sustained, on the ground that it was not proper in cross examination. The ruling is complained of as erroneous. We think it was correct. The witness had stated facts, and not his opinion of defendant's sanity. The question, therefore, did not relate to matters brought out upon the direct examination.

VII. Other objections to the proceedings and judgment are based upon the rulings of the court in giving and refusing instructions, and in overruling a motion for a new trial on the ground that the verdict is in conflict with the evidence and the law as given to the jury by the court. The consideration of the objections demands attention to the testimony given upon the trial. We will proceed to state, briefly, the purport of the evidence, so far as it is necessary for the proper understanding of the questions we are called upon to discuss and determine.

The defendant, at the time of the homicide, was a farmer and about fifty-two years of age. He had sons and daughters of mature years and others yet in childhood. About one

year prior to this event he had employed Dr. Joseph W. Hatton, for the killing of whom he was convicted in the court below, to attend upon his wife in child-birth. The evidence tends to show that defendant charged Dr. Hatton with mal-practice in his professional treatment of the case and with improper exposure of the person of his wife and other cruel and unprofessional conduct, whereby the health of the patient was permanently impaired and her womanly feelings outraged and wounded. To recover for these injuries to the health of his wife, defendant brought and prosecuted an action against Dr. Hatton, which resulted favorably for the physician. After the confinement of his wife and up to the killing of Dr. Hatton, defendant exhibited violent excitement upon the subject of the alleged injuries to his wife and himself. They were the subject of his conversation to many persons, and he rehearsed the incidents connected therewith in public places in the hearing of all who would give heed thereto. In these conversations he indulged in violent denunciations of the physician, accompanying it with great profanity, and declared he lacked skill and ability in his profession and was destitute of qualities necessary to fit him therefor. He made threats against the person and life of Dr. Hatton, declaring that it was his purpose to drive the physician from the country by the suit, and if it failed in such object, he would shoot the doctor. These threats were frequent, and those made after the suit was terminated against defendant were unaccompanied by qualification or condition. They were communicated to Dr. Hatton, who armed himself for protection against defendant, to whom this fact was soon made known.

On Sunday, the 18th of July, 1875, Dr. Hatton was called to visit professionally a patient living about a mile and a half from defendant's place of residence. The father of the physician, a man of seventy-two years of age, accompanied him in his buggy, and they passed within a quarter of a mile of defendant's house. They also drove near the house of a neighbor where defendant was at the time. He was informed of the fact of their passing the house and immediately left,

after expressing his want of confidence in the physician's skill, and went in the direction of his own house. He had come but a short time before to this neighbor's from the house of the patient, who had informed him of the fact that Dr. Hatton was expected and would soon arrive. Upon receiving this information he expressed, angrily, his want of confidence in the skill of the physician.

In returning from the visit to the patient the road traveled by Dr. Hatton and his father took them again near defendant's house. They reached this place not long after defendant had left his neighbor's house, as above stated. The incidents immediately connected with the act of defendant which resulted in the killing are related by the father of Dr. Hatton in the following language: "After we got around the willows, we saw defendant going through the fence, with his gun in his hand, east of us—might have been eighty or a hundred yards; defendant came through his fence across first track of road to second road; came in front of doctor when pretty near his gate; we were driving on a trot; he came down the road with his gun; thumb looked like on the cock; he raised up and doctor said 'stop!' this is all the doctor said, when gun went off; gun about three feet long; don't think it was a second after he raised up until he shot; don't know whether he took aim or not; we had a two-stepped buggy; my left foot was out on upper step; when the gun went off the doctor fell over my right thigh, and it scared the team; they went on; I went out near Mewherter's gate; looked back and saw defendant behind, standing in the path, about half bent, with gun presented like he was going to shoot again, but he did not; looked back again; defendant said, 'Oh! God damn you, I have killed you'; that was all defendant said." The shot took effect in the abdomen and the doctor lived about two weeks.

The fact of killing was not contested at the trial; the defense wholly relied upon was the alleged insanity of defendant. The testimony tended to establish that after the confinement of defendant's wife, when she was treated by Dr. Hatton, defendant's disposition, temper and deportment, whenever that subject was spoken of by him or his mind was directed toward

the physician, were unlike, in their manifestations, anything before exhibited by him. He was violent, unreasonable and extremely denunciatory and bitter in his expressions. His appearance, too, on such occasions, was changed, exhibiting great excitement and nervousness. His wife and children testified that he was wakeful and restless at night, would arise from his bed and arm himself, and, as an explanation of his actions, would declare he was guarding his wife. He would often declare that his troubles were more than he could bear, and when the name of Dr. Hatton was mentioned would become pale, wild and nervous. His appetite was poor and he became thin. They state that his actions were unusual and strange; but neither they nor other witnesses testify to any change in his mind or manner upon any other subject than that of his troubles with Dr. Hatton. There is no evidence tending to prove that, upon all other subjects, he was not reasonable, and, indeed, it is not so claimed on the part of the defense.

Upon evidence of the character indicated above, the cause was submitted to the jury upon numerous instructions upon the law of the case given by the court. After we have considered the correctness of the ruling in excluding certain instructions asked by defendant, those given will claim our attention.

VIII. Counsel for the defendant presented seven separate instructions which they requested to be given to the jury. 5. CRIMINAL They all related to the subject of insanity, which law: insanity: uncontrolla- was, as before stated, the sole ground of defense ble propen- sity. relied upon. These instructions present rules to guide the jury in determining defendant's accountability. The nature, character and extent of mental disease which renders the subject irresponsible for acts otherwise criminal are stated therein. The substance of these instructions, except of the fifth, is fully and fairly embraced in the ninth, tenth, eleventh and twelfth, given upon the court's own motion. These will be hereafter considered. The refusal to repeat rules announced in instructions, by giving them in another form as asked by either party, has often been held not to be error.

The State v. Mewherter.

The fifth instruction just referred to is in the following language so far as it treats of the question of insanity: " If * * * * the propensity in the defendant, from whatever cause it may have originated, to commit the act, existed in such violence as to subject the intellect, control the will, and render it impossible for the accused to do otherwise than yield to the insane impulse by which he was controlled and the act was the offspring of such insanity," in such case " neither the State nor the interest of society demanded such conviction." A glance will suffice to discover the error of the rule here presented. The *propensity*—the disposition to commit the crime, is not, as it should be, limited to the effect of a diseased or insane mind. Under the instruction it may have had its origin in anger, revenge or other passion not springing from an insane mind, or may have been the result of drunkenness. It cannot be claimed that an uncontrollable *propensity*, which is the offspring of an evil passion, will shield the perpetrator of crime from punishment. The subject demands no further attention. The instruction was properly refused.

IX. The seventh instruction is in the following language: " If the jury believe, from the evidence, that, at the time of the commission of the alleged homicide, the defendant was laboring under a diseased condition of the mind, that he was insane on the subject of the manner in which the deceased had treated his wife, and on the subject of deceased, with others, having formed a conspiracy to take his (defendant's) life, then the jury should acquit the defendant."

It will be at once observed that this instruction fails to present the condition, that the mental disease must have destroyed the power of defendant to comprehend, rationally, the nature and consequence of his act and overpowered his will, which must exist in order to render him free from accountability for his acts. *State v. Felter*, 25 Iowa, 68.

X. We will here depart from the order pursued by defendant's counsel in considering their objections to the record, and take up the instructions given by the court upon the sub-

ject of insanity. The rulings of the court upon the law governing this defense will thus be considered consecutively.

After defining, in the ninth instruction, total insanity or madness, and informing the jury that one afflicted with such mental disease is not criminally responsible, the court proceeds, in the tenth instruction, to announce the rule of law applicable to partial insanity, which, it was claimed in the defense, was the character of the alleged disorder of the mind of defendant. The jury were informed that if defendant, on account of his mental disease, was not able to distinguish right and wrong and had not knowledge and understanding of the character and consequences of his act and power of will to abstain from it, he was not legally a responsible being. This is the certain meaning of this instruction, expressed with sufficient clearness. It is in harmony with the rule on the subject recognized by this court in *The State v. Felter*, 25 Iowa, 67.

XI. The eleventh and twelfth instructions given to the jury present substantially the doctrines announced in the answer of

7. ——: —: the judges to the first and fourth questions pro-
delusion. pounded to them by the House of Lords in *Mc-Naughton's Cases*, 10 Clark & Finnelly's Reports, 200. They may be briefly stated as follows: 1. In case of partial insanity, or delusion, as to certain facts and matters, and the accused, as to other facts and matters, is sane, if the act with which he is charged was done under the influence of insane delusion, with the view of redressing or avenging some supposed injury, or of accomplishing some supposed good, he is punishable, if he knew at the time of the commission of the crime that he was acting contrary to law. 4. In case of partial delusion, when the subject is not in other respects insane, the law considers him, as to his responsibility, in the same condition as if the facts, in regard to which his delusion exists, were real. Therefore, if in his delusion he supposes another is about to take his life, he would be exempt from punishment if he kills the person in, as he believes, self-defense. But if the delusion was to the effect that he had suffered a serious injury from another man, and, in revenge therefor, the accused kills that man, the

crime will be punished by the law, notwithstanding the perpetration of the deed was affected with a disease of the mind.

These doctrines, it is believed, have the support of the adjudged cases of this country and England. See 1 Wharton & Stille's Med. Jurisp., §§ 125, 126, et seq., and cases cited. They are not, we are aware, fully approved by others entitled to respect. See section 130 of the book just cited, and Balfour Browne's Medical Jurisprudence of Insanity, pp. 18, 19. They have been assailed with great force by another able writer upon the medico-legal science. Ray's Medical Jurisprudence of Insanity, §§ 29–39, 306.

XII. Counsel for defendant raise many objections to the instructions given by the court which are based upon criticisms of the language rather than upon the very substance of the principles announced therein. We will notice one or two which will present fairly the character of all of these objections.

The second instruction defines correctly the different degrees of homicide. Murder, the jury is informed, is the killing of a human being with malice aforethought, either express or implied. The crime, they are then told, possesses two elements: *first*, the killing of a human being; *second*, the malice. The court proceeds clearly enough to explain the term malice and points out when it will be presumed to be of the degree or character which constitutes murder. But, in using the term malice in these explanations, the adjective *aforethought* is not used in connection with it. This is the ground of counsel's criticisms. They are not well founded. The court in the language complained of explained to the jury what facts authorized the conclusion that malice had the quality of being aforethought. It was not necessary in doing so to couple the adjective, the meaning of which the court was explaining, with the word malice whenever it was used.

XIII. Another instruction directed the jury to consider all the facts connected with defendant's conduct, language, appearance, etc., preceding the alleged homicide, upon the 9. ——: —: question of defendant's insanity. They were ininstruction. formed that these facts were to be considered to enable them

to test the value of the opinions expressed by witnesses upon that subject, and also to determine the fact whether the insanity was established independently of such opinions. The purport of the instruction is obvious. If witnesses had testified that defendant was sane, and his actions, as shown by the testimony, were unmistakably those of an insane man, surely this should, in the minds of the jury, destroy the force of the opinions and lead them to the conclusion, upon the evidence of his actions alone, to find the existence of insanity. The like rule would be applicable did his acts establish sanity when the opinions of the witnesses were the other way. The objection to the instruction is without force. Others of the same character need not be noticed.

XIV. An instruction, which is assailed by counsel, holds that the crime of murder in the second degree may be found when death was not intended by the accused. This court has more than once ruled to this effect. *State v. Decklotts*, 19 Iowa, 447; *State v. Morphy*, 33 Iowa, 270.

XV. Complaint is made that the instructions unfairly present the case to the jury, in that principles of law, which, in their application, would be against defendant, are emphasized, and others which in the same manner would be favorable, are not presented with the same force. Numerous objections of this character, which are rather to the manner of the instructions than to their substance, are made. A careful study of the District Court's charge satisfies us that these complaints and objections are without foundation. No good purpose would be accomplished by presenting each objection of this character and pointing out its want of soundness. All the instructions given to the jury, in our opinion, are in accord with the law.

XVI. We think the verdict is amply supported by the evidence, and that the court rightly overruled the motion for a new trial based upon the ground of the insufficiency of the testimony to support the conviction.

AFFIRMED.