## WILLIAM WILLIS *v.* THE PEOPLE.

An irritable temper and an excitable disposition are not of themselves evidence of insanity.

Where the prisoner at the time of the killing is in such a state of mind as to know that the act he is committing is unlawful and morally wrong, he is responsible as a sane man.

*It seems*, that the want of indifference of a juror may be considered as a cause for setting aside a verdict on a motion for that purpose; and that the verdict should be set aside when the facts are of a character likely to prejudice the prisoner.

*It seems*, the Court of Oyer and Terminer may entertain a motion to set aside a verdict for such cause, but has no authority to grant a new trial upon the merits.

*It seems*, that when it is made to appear that the purposes of justice have been perverted to the injury of the accused by practices *dehors* the trial, or by procuring improper persons to sit upon the jury, or by the management of any person which could not be guarded against by ordinary care and attention, the court in which the miscarriage took place, may set aside the verdict as a mistrial, etc.

WRIT of error to the Supreme Court, to review a judgment of that court, affirming the conviction of, and judgment against the plaintiff in error in the Court of Oyer and Terminer of the county of Ulster.

The plaintiff in error, in March, 1864, was tried in the Court of Oyer and Terminer, on an indictment for the murder of one Mary E. Phelan, the wife of Robert Phelan, alleged to have been committed on the 9th day of April, 1863, in the town of Wawarsing, Ulster county. The fact of the homicide was clearly established. It appeared that the prisoner and the deceased had been engaged to marry each other. He enlisted as a volunteer in the service of the United States, and, after an absence of some length with the army, returned to Ulster county on business connected with recruiting. About this period he fell into gross habits of intemperance, in consequence of which the engagement was broken off by the deceased; and in a little less than a week before the homicide she was married to Mr. Phelan. The prisoner, at the expiration of his recruiting service, returned

to the army, but was afterwards discharged, and came back to Ulster county some weeks before the murder. Several letters which had passed between the deceased and the prisoner were given in evidence, from which it appeared that a very strong mutual atachment existed. One, written by him to her, after his return to the army, in which he admitted his bad habits, allowed her to retract her engagement and marry some other person if she wished to do so, though he professed to be still warmly attached to her. It was shown that he was a person of an excitable temperament, easily moved to tears, and strongly affected by the intimacy of the deceased with, and her marriage to, Mr. Phelan. It appeared that during his first absence with the army, in a conversation with a comrade, when the possibility of the deceased marrying another person was suggested, he was very much excited, and while he expressed a strong confidence that she would never prove false to him, declared that if she did, the man who married her would not long enjoy his happiness; that he would not like her to live long, or to live himself after her.

On the morning of the homicide he procured a knife from the shop of a harness maker, went to the house of the deceased, who was alone, seized hold of her and plunged the weapon into her neck several times, causing her death immediately. He then went to a shop near by, where her husband was, and carrying the knife, and with his hands covered with blood, and accused him, the husband, of being the murderer. He then went away, but made no effort to evade pursuit, freely admitted the murder, sometimes justifying it and at other times expressing sorrow for the act. Some letters of his, written when in jail to the editor of a newspaper, which were given in evidence, evinced an average amount of sense and intelligence, but a somewhat conceited and eccentric disposition.

The only exception taken by the prisoner's counsel was to a portion of the charge of the judge. He, in submitting the case to the jury, went over some of the principal points of the evidence, and upon the subject of the defense of insanity

observed as follows: "I am bound to tell you as matter of law, that the mere fact of the prisoner being more than usually excitable, that he is more liable to be irritated than the generality of men, that he has a more irascible temper than men generally have, is not evidence of insanity. It certainly is not insanity. It can scarcely be evidence of insanity. It must be regarded, if at all, as evidence of the condition of a man more easily becoming insane, more liable to become insane; not, however, of insanity itself. What other evidence is there in the case? Why, it is alleged that the act itself evinces insanity. Well, gentlemen, I hardly think it necessary to define to you what insanity is; I think you understand it. A person is not insane, surely, who knows right from wrong, and who knows that the act he is committing is a violation of law and is wrong in itself. If he is conscious that the act is wrong at the time he is committing it, that it is a violation of law, that it is a violation of the law of the land, he cannot be said to be insane. If, however, at the time of committing the act he is under a delusion, if he does not know right from wrong—he does not know that the act he commits is an offense—he does not know that it is wrong, but is under a delusion in regard to it, why surely he is not responsible for his acts—he is an insane man." In another part of his remarks the judge charged that it was for the jury and not for the court to determine whether the prisoner was really insane.

The prisoner's counsel excepted to so much of the charge as held that a man is not insane who knows right from wrong, and knows that the act he is committing is a violation of law and wrong in itself. The jury found the prisoner guilty.

On the next day, the counsel of the prisoner moved the court for a new trial on affidavits. Three persons swore, in effect, that they had heard one of the jurors, Smith H. Shaw, before the trial, express his opinion that the prisoner was guilty of the murder and ought to be hanged. The juror made an affidavit, denying that he had made use of those expressions in words or substance, and asserted that he had never, prior to the trial, formed or expressed an opinion

touching the guilt or innocence of the accused. It appeared that this juror was a talesman, and that, when called to sit on the jury, he had been examined by the court on oath touching his qualifications, and had declared that, although he had heard about the case, he had no opinion respecting it.

The motion was denied, and the prisoner was sentenced to be executed on a day named.

On the return of the writ of error, in the Supreme Court, the prisoner's counsel moved, at a General Term, on the same affidavits which had been read in the Oyer and Terminer, and some additional ones, to set aside the verdict and for a new trial. These affidavits were met by others, read on the part of the people. All the affidavits related to the same alleged expressions of opinion by the juryman, Shaw, which had been sworn to in the first mentioned affidavits.

The Supreme Court took these papers into consideration in rendering their judgment on the writ of error; and, although it was held, according to the written opinion, that such a motion, made upon affidavits, could be entertained by the court, it was considered that it was not shown that Shaw was incompetent to sit as a juror for the causes alleged.

The present writ of error was brought upon the judgment of affirmance, in connection with the order denying a new trial.

*T. R. Westbrook* and *E. Cooke*, for the plaintiff in error.

*D. M. Dewitt*, for the people.

DENIO, Ch. J. I am of opinion that the charge in its general scope was entirely correct, and that there was no error in the particular part which was specially excepted to. The judge instructed the jury, in effect, that an irritable temper and an excitable disposition of mind did not constitute insanity; that an individual possessing such mental peculiarities was more predisposed to an attack of insanity than men in general, but was not on that account actually insane; that such peculiarities were not of themselves evidence of insanity. He then proceeded to state what did constitute

mental alienation, and said that if at the time of the act the person was under a delusion, and did not know right from wrong, or that the act was an offense or was wrong, he was insane, and was not responsible for the act; but that a person was not insane who knew right from wrong, and that the act he was committing was a violation of law, and wrong in itself. These positions were laid down in an abstract form. The judge might have said that if the prisoner, when he killed the deceased, was in such a state of mind as to know that the deed was unlawful and morally wrong, he was responsible, and that otherwise he was not. This would perhaps have been more precise and discriminating; but as the jury was only concerned with the prisoner's condition when he committed the act which was under investigation, it was impossible that the instruction should have been misunderstood. The prisoner's counsel must have been of that opinion, for they did not require that it should be pointed more distinctly to the killing of the deceased. The general correctness of the position laid down cannot be questioned. It is in substance and in the language usually adopted, and which is sanctioned by the authorities. (*Freeman* v. *The People*, 4 Denio, 9, and cases cited by BEARDSLEY, J.)

The prisoner's counsel sought in various forms to impeach the conviction on account of the alleged want of indifference of the juror Smith H. Shaw. I assume that it was competent for the Court of Oyer and Terminer to entertain a motion to set aside the verdict for the cause alleged, if they had determined that the facts were established and were of a character likely to prejudice the prisoner. The case of *Quimbo Appo* v. *The People* (20 N. Y., 531) only determines that Courts of Oyer and Terminer have no jurisdiction to grant new trials upon the merits. I suppose that if it should be made to appear that the purposes of justice had been perverted to the injury of the accused by practices *dehors* the trial, as by procuring improper persons to sit upon the jury, by management on the part of any person which could not be guarded against by ordinary care and attention, or the like, or by an accident, and without the fault of the prisoner, that the same

court in which the miscarriage took place, might set aside the verdict as for a mistrial, and that the prisoner might be again tried. This seems to have been the view of the King's Bench in *The King* v. *Fowler* (4 Barn. & Ald., 273), and the practice is countenanced by this court in the leading opinion in *Quimbo Appo's Case* (p. 552), and in *Stephens* v. *The People*, to which I shall refer. But it is not material to pursue this inquiry, as the Court of Oyer and Terminer, in the present instance, entertained the prisoner's motion and disposed of it, we are to assume, on the ground that a satisfactory case for disturbing the verdict had not been made out.

The further question is whether the determination of the motion was reviewable on the writ of error to the Supreme Court. When a writ of error is brought to the court of original jurisdiction in a criminal case, the questions which arise are those appearing upon the record; and if a bill of exceptions has been taken — the merits of the exceptions. There may be matters which would not appear upon the ordinary return required by the statute, to a writ of error, but which are in their nature connected with, and form part of the record, which may be brought up in *certiorari*, issued upon allegations of diminution, or which may appear by papers annexed to the record and returned with it. Such was the case of *Cancemi* v. *The People* (18 N. Y., 128), which was tried by consent by eleven jurors. That circumstance, together with the stipulation consenting to that mode of trial being stated in the return, the judgment was reversed because the indictment had not been tried by a legal jury. In *Stephens* v. *The People* (19 Id., 549), certain matters which could not well form part of the record were returned on the writ of error to this court, and were considered. Our judgment, however, was one of affirmance, and there is nothing in the opinion countenancing the idea that a judgment could be reversed for an irregularity which could form no part of record. At common law the only review in criminal cases, unless the indictment was tried on the *civil side*, as it was called, was by writ of error, upon which only the record and such outlying matters as could be

returned on *certiorari* issued upon an allegation of diminu-
tion, could be returned. But as it often happened that ques
tions of law of great importance would arise in the course of
the trial, and would be determined definitively by the ruling
of the court, a practice had grown up, before the revision of
the laws of 1830, of taking the opinion of the Supreme Court
in an informal way; but this, it seems, could not be done
without the assent of the prosecuting attorney, except by a
voluntary application by the court. Hence, upon the revision
of the criminal law, provisions were introduced allowing bills
of exceptions to be tendered and settled. (2 R. S., 736 and
*seq.*) In introducing this provision to the legislature, the
commissioners remarked that the only way in which an
objection to any decision could be examined by a Superior
Court, was by the consent of the public prosecutor, or by sus-
pending judgment and taking the advice of the Supreme
Court. Thus, they continued, while in any controversy con-
cerning property of the most trifling value, a party may
have a review of any decision which has been made, yet in
cases involving personal liberty, imprisonment in a State
prison and lasting infamy, he must depend on the caprice of
the prosecutor or the magnanimity of a judge, to admit the
probability of error; that the mode pursued by the court
to ask advice was irregular, and gave no authority to enforce
the advice, while it did not enable the accused to present his
case himself. They therefore proposed the provisions allow-
ing exceptions, as in civil cases, and their suggestions were
adopted. The method of reviewing decisions in criminal
cases, as the law now exists, is embraced in the statutory pro-
visions which have been referred to, and certain others con-
nected with that system. The judgment may be stayed after
verdict, and the case be brought before the Supreme Court
on *certiorari*, when the exceptions may be passed upon; or,
if judgment be not stayed, a writ of error may be brought on
the record, with which the exceptions, if any were taken, are
to be returned, when any question arising upon either the
record or bill of exceptions, or both, may be examined. The
matters stated in the affidavits, upon which the motion was

made in the Oyer and Terminer, took place out of court. They could not be made to appear by the record, for they formed no part of the proceedings; and they could not be the subject of exceptions, for they did not take place on the trial, and were not brought to the attention of the court until after the verdict was given. We are referred to a case in 16 Johns., 8, *In the matter of Bradstreet, &c.*, where the Supreme Court issued a writ in the nature of a supersedeas to certain statutory commissioners, in a case where there was no action pending in the court. The court does undoubtedly possess a certain superintending power over inferior tribunals and officers; but in criminal cases, the only review in that court is that authorized by the statute to which I have referred.

It follows that the judgment of the Court of Oyer and Terminer was final. Should it be said that irremediable error may in this way be committed in determining such motions, it may be answered that error may occur in any stage of a case, and even in the highest court. The question in all cases is, in what tribunal the right to make a final determination is vested. In my opinion such questions as those which arose upon the motion in the Oyer and Terminer, belong exclusively to that court to adjudge. The only method of remedying any error which may occur there, is by the exercise of the executive prerogative of pardon.

It follows, also, from what has been said, that neither the merits of the motion in the Oyer and Terminer, nor the original motion for a new trial, made at the General Term of the Supreme Court, ought to have been entertained by that court. The record was there for the sole purpose of examining the alleged errors contained in it, if any, and those arising upon the rulings and determinations which were set out in the bill of exceptions. The circumstance that the affidavits used in the Oyer and Terminer were returned to the Supreme Court, and that these papers, and those which were first introduced at the General Term, have been returned here, and that they are all printed in the error book, makes no difference. Jurisdiction cannot be conferred by an error

of the clerk in returning superfluous papers, or in the causing them to be printed in the error book.

I am of opinion that the judgment of the Supreme Court ought to be affirmed.

As the time fixed by the Supreme Court for the execution of the sentence has elapsed, the proceedings will be remitted to the Supreme Court, to the end that it may direct the sentence to be executed according to law.

All the judges concurring, the judgment of the Supreme Court was affirmed.