After a trial continued through several weeks, and a most able and interesting argument of the case to the jury, by Messrs. Mitchell, Beach, and Brady ■ for the prisoner, and Messrs. Sedgwick and Tremain for the people, Hogeb.oom, J., charged the jury as follows :
This protracted trial is' about to be closed, and to 7bé submitted to you for final decision. You are prepared for it by faithful attention to the testimony, and ¡to the arguments of counsel.
This attention is called for by the magnitude and importance of the case. The position of the jury is a -solemn and responsible one. The life and liberty of a fellow-citizen is in your hands, and is not to be disposed • of without the most anxious and serious consideration of all the circumstances, and grave reflection upon the ■weighty results that hang upon your decision. Nevertheless, it is a duty which you cannot decline, which ¡the law has imposed upon you, which you have taken an • oath to discharge with conscientiousness and fidelity, and ; ■which must be discharged with absolute fearlessness ;and impartiality, whatever may be the consequences, j .and upon whomsoever they may fall.
Q-eorge W. Cole stands indicted for the murder of L. .Harris Hiscock, on June 4,1867, at Stanwix Hall, in the ■ city of' Albany. Under this indictment he may, if the .evidence justifies it) be convicted of either of the two de *323 grees of murder, or of the four degrees of manslaughter, or acquitted upon the ground of justifiable or excusable homicide, or of an absolute or temporary deprivation of reason, the result of settled insanity, or of a momentary, but ungovernable, frenzy, induced by the circumstances of the particular occasion.
It may be desirable to inform you, particularly, of the ingredients which go to make up the crimes of murder and manslaughter, in their various degrees. Murder, in the first degree, so far as it can have application to this particular case, is the killing of a human being, when not justifiable or excusable, nor coming under the head of manslaughter, and perpetrated with a premed tated design to effect death.
The premeditated design must be completely formed before the act of killing, and must precede the act, but no particular space of time is necessary to intervene between the complete conception of its design and its execution. If a perfected design precedes the act, it is murder. This is murder in the first degree, and its punishment is death.
Murder, in the second degree, embraces all cases of murder which are not included in the definition of murder in the first degree. It is not well defined in the law, but may safely, I think, be held to include cases of unjustifiable, and unlawful, and inexcusable killing, characterized 'by premeditated design, or by no premeditation beyond an intention to pro luce death ; but not by that degree of enormity, willfulness, and premeditation which mark the commission of murder in the first degree.
The line of distinction between murder in the first degree and in the second degree, is not very dearly defined in the statute ; and something is left to the sound and intelligent judgment of the jury, in fixing the degree of the crime. The punishment of murder in the second degree, if I have read the statute aright, is imprisonment in the State prison not less than ten years.
Manslaughter in the first degree is not applicable to the facts of this case. Perhaps, not manslaughter in the *324 second degree ; though one division of it, the killing of a human being without a design to effect death, in the heat of passion, but in a cruel and unusual manner, might possibly be contended to embrace it; but as manslaughter in the third degree is the same offense, except that it is killing accomplished by a dangerous weapon, instead of a'cruel and unusual manner, I present that aspect of the offense to you as better adapted to the facts of this case than manslaughter in the second degree, and also as being milder in its penalty, and therefore more favorable to the prisoner.
The punishment of manslaughter in the third degree is, I believe, as modified by the statute of 1865, punishment in the State prison, not less than one, and not more than four year’s. Every, other killing of a human being by the act, procurement, or culpable negligence of another, where not justifiable nor excusable, nor murder, nor manslaughter of a higher degree, is manslaughter in the fourth degree. The punishment of manslaughter in the fourth degree is imprisonment in the State prison for not exceeding one year, or in the county jail not exceeding one year; or by fine not exceeding one thousand dollars, or by both such fine and imprisonment. The feature which particularly .distinguishes manslaughter from murder is, the absence of a design to effect death.
Applying these definitions to this particular case; if you believe Cole killed Hiseock without legal justification or excuse, in the possession of his faculties, and with a mind capable of comprehending the quality of the act, and with a premeditated design to effect his death, he is guilty of murder in the first or second degree, according to the enormity of the act, and the degree of premeditation with which it was perpetrated. If done without a design to effect death, but in the heat of passion, and with a dangerous weapon, then he is guilty of manslaughter in the third degree. If done in some other way, but without a design to effect death, *325 and in the heat of passion, then he is guilty of manslaughter in the fourth degree.
But to constitute guilt and criminality in either of these various ways, it is necessary that the person should be capable of distinguishing between right and wrong in the particular case, and as applied to the features of the particular transaction ; that he should be in the possession of his faculties ; in the exercise of his reason; not necessarily with faculties in the same vigor or force, or under the same equanimity of mind as when perfectly cool, or in perfect health, but with faculties from which reason is not permanently or temporarily dethroned.
All men have not the same mental powers or characteristics,—the same man is not at all times in the same condition for the cool and equable exercise of his reason or mental powers ; the strength and vigor of his faculties may even be temporarily or permanently impaired or diminished by sickness or bodily ailment, or by exciting causes calculated to disturb his equanimity or to influence his passions, yet, if he be in the possession of his senses,—able to judge of the moral qualities of his acts, and of the particular act for which he is arraigned, and to distinguish between right and wrong in regard to it,—he is morally and legally responsible for his conduct, amenable to the laws of the land, and must abide by its mandates and its penalties. If, then, George W. Cole was iii this condition, he must, like other men, be tried by the standards of the law, and submit to its judgment. If, on the contrary, he committed this homicide when reason was dethroned, either permanently or temporarily, no matter from what cause, he is not amenable to the law, and is not subject to its punishment or its , penalties.
And of all these facts necessary to establish crime, and to constitute responsibii-ty for its commission, the People are to satisfy you, and to satisfy you beyond a reasonable doubt. They are to convince you that the prisoner was a rational being in the possession of his senses, with the power to discriminate between right *326 and wrong in the particular case, and that the act which he committed, and for which he is now on trial, falls within one of the various offenses to which I have referred. And if there be a rational doubt of this upon your minds, the prisoner is entitled to the benefit of that doubt. The prosecution must make out to your ■ satisfaction the guilt of the prisoner in regard to all the features of the crime, and satisfy you of their existence, beyond a reasonable doubt. Thus, if the charge be murder, they must convince you that the killing was perpetrated by the defendant, that it was done with premeditated design and by a person of sane mind. No doubt sanity is the normal or usual condition of human beings, and hence ordinarily you would be satisfied of its existence by much less proof than you would be in some other cases. But still, either by presumption of law or by positive proof, you must be satisfied of its existence, and of its existence beyond a reasonable doubt. This doubt, however, must be one that fairly arises upon the evidence, not merely speculative or fanciful, but one that commends itself to your judgment upon a fair and rational construction of the evidence, not to be lightly or capriciously indulged, and especially not as a mere mode of evading the responsibility of a careful and deliberate judgment upon the testimony, but a doubt resting upon your minds as the result of a most conscientious examination of the evidence.
These are the tests which you must bring to the examination and decision of this case, and by which you must be controlled in the result to which you ultimately arrive.
Having thus defined the offenses of which it is possible under this indictment to convict the prisoner, if your views of the evidence warrant it, let us turn our attention a little more particularly to the facts of this case, and the allegations of the parties in regard to them.
I. The leading fact, of the killing of L. Hams His-cock by George W. Cole, is not denied. It is very distinctly proved to have occurred at Stanwix Hall, *327 Albany, on the 4th of June, 1867, by a pistol shot, producing almost instant death. As no provocation appears to have been given at the time of the homicide, nor any conversation was had between the parties at the moment, we must probably look elsewhere for the cause which produced it, and for the justification by which ii is to be maintained. And there being no justification (that question, however, I submit to you), apparent in the circum-tances, occurring at the time, you would probably consider yourselves justified in concluding, that in the absence of explanatory circumstances, it would be safe to infer malice aforethought, or a premeditated design to effect the death of the person killed.
II. There are, however, if I understand the line of defense, two reasons claimed to exist, which should protect the defendant from punishment.
1. Because the defendant was not in a state of mind that renders him responsible for the act—in other words that, from causes operating for a considerable length of time beforehand, or recently or suddenly occurring, he was mentally unconscious of the nature of the act in which he was engaged, and legally irresponsible for it.
2. Because the deceased had seduced the wife of the defendant, and that in the transport of rage produced in-the defendant by such an invasion of his domestic rights, or by the sudden and overwhelming disclosure of the fact to him, he committed the homicide for which he is now on trial.
As the first of these defenses, if established, furnishes a complete and absolute protection to the defendant from any liability to the law, for the act committed, it may be well to examine that first in order.
The first defense relied on, then, is insanity,—a deprivation of reason at the time the act was committed, resulting either from a settled and well established mental alienation, or from the pressure and overpowering weight of the circumstances occurring at the time, and from the transport of passion arising from sudden and crushing *328 information of the infidelity of his wife, yielding to the arts and seductions of her paramour.
As I have just stated, this is a valid defense, if satisfactorily established by the evidence.
If reason was, in fact, dethroned, if Cole was not at the time in the possession of his faculties, if they were overpowered and lost in the presence and under the influence of an overwhelming domestic calamity ; if Cole was at the time incapable of distinguishing between right and wrong, in regard to this transaction, or of appreciating the moral quality of his act, and the evidence satisfies you that this was so, then, like every other man in that condition, he cannot be held criminally responsible for the homicide, and is entitled to your verdict of acquittal.
But while you must remember that the prisoner’s sanity must be established by the prosecution, and established beyond a reasonable doubt, you must also remember that the ordinary condition of man is sanity, and not insanity, and that, as a general rule, he is responsible for his acts, and not exempt from responsibility.
In judging of Cole’s mental condition, it is highly important, paiticularly to examine his conduct at the time and about the time of the transaction.
If Cole committed this act with apparent coolness and deliberation—although more or less excited—spoke of it with apparent intelligence and decision, and appreciation of its character and effect—if he mentioned it immediately afterwards as if he understood what he had been doing, and recognized its nature and object ; if he armed himself with a pistol or pistols, the day before, at Syracuse, and you shall conclude he did so with reference to this encounter and this occasion,—of which you are to judge with most careful discrimination, because it bears with much force on the issues in this case,—if he took measures to have a weapon or weapons in a situation to be effective, and loaded them so as to be likely to operate ; and if, after reflection on *329 the subject, and a conference with one or more of his friends, he proceeded deliberately to the commission of this act of killing, and with effect; these are all legitimate subjects for your consideration, as well on the question of sanity as on the question of a premeditated design to effect the death of the person killed.
You must judge of the character and motive of the defendant’s acts.
What was his object in providing himself with these pistols ? Was it with reference to this occasion, or was it connected with the discharge of his duties in the revenue service? Was the killing (as defendant’s counsel contend), not premeditated, when the prisoner visited and entered Stanwix Hall ? Was he moved to the commission of this act by the sudden access and irresistible pressure of excited and overwhelming passion, roused by the sudden and unexpected sight of the destroyer of his domestic peace, or him whom he supposed to be such—the defiler of his marriage bed—the seducer of the dearest object of his affections—dethroning his reason, and pressing him on to the commission of this act, under the influence of an ungovernable frenzy, unsettling for the time his faculties, and enthroning insanity in their place ?
These are questions submitted to your most careful and deliberate judgment, and will require the application of your best faculties and your most impartial and conscientious deliberations, in order to conduct you to a right result.
The defendant’s state of mind, as evinced by his conduct, by his declarations and his acts, by his bodily ailments as affecting his mental condition, his cheerful or moody temperament, the change (if there was one) in the character of his temper and disposition, the extent to which it was carried, the causes which produced it, and other circumstances not necessary to be alluded to at greater length, as exhibited at and about the period of the homicide, and for a period previous thereto, more or less distant from the central and important point, to *330 which your attention will naturally be more especially directed,—are all important subjects for your consideration, and are entitled to more or less weight, according to their nature, and to some extent according to their nearness in point of time to the scene of the fatal transaction.
In illustration of the prisoner’s mental condition, much medical evidence has been introduced, and must be considered by you. It is for you to judge of its weight and character, and to determine it by the best light you have.
As one means of determining it, it seems to me (it is, however, for you to judge), that other things being equal, those medical witnesses who were acquainted with the prisoner, with his ordinary habits and temperament, with his personal history before and at the time of the transaction, would on that account possess some advantages in forming an estimate of the prisoner’s mental condition.
Still, much must depend upon the capacity, judgment and discrimination of the particular witness, and upon the manner in which the testimony is presented.
With witnesses who have not had a personal acquaintance with the prisoner, or opportunities for a personal examination, the weight of their testimony must depend somewhat upon other considerations, and upon evidence of the causes, influences, symptoms and characteristics which usually mark the presence of mental derangement.
Some of this, perhaps much of this, where the prisoner has not been known or personally examined, must necessarily be more or less matter of mere opinion, the value of which it is not always possible correctly to estimate.
Several causes may operate to produce insanity, and are entitled to more or less consideration in the particular case.
Insanity is sometimes inherited,—transmitted down in the line of family descent, occasionally not exhibiting itself, and again reappearing after one or more generations.
*331 Some evidence has been given that this taint of insanity ex'sted in the family of the defendant. This is a subject lor your consideration ; but you must recollect that the reappearance of this mental disorder is not uniform, and you must carefully scan the prisoner’s declarations, his acts, his general conduct, his mental manifestations, to see whether you find in them the traces of actual insanity,—-thatactual mental derangement, which alone can avail, so far as this point is concerned, to accomplish p -rfect immunity from criminal responsibility.
Again, it is said that the prisoner’s bodily ailments were of such a character as justly to lead to the inference that they were calculated to affect, and did affect, his mental organization and developments in such a way as to produce insanity.
There seems no reason to doubt that in 1862, Gen. Cole, while doing honorable service in the cause of his country,—for which, whatever may be his fate under this accusation, he deserves grateful recognition,—received a severe and crushing injury, followed by other injuries thereafter, from the effects of which he has not yet fully recovered, which more or less disabled him, and which were calculated to have, and did have, a depressing effect upon his spirits and temperament, making him more or less, moody and melancholy, producing more or less and sometimes very considerable depression of spirits, resulting, as his counsel claim, in a settled melancholy, allied to, if not identical with the melancholia of the medical profession, and constituting one of the various forms in which, as they contend, insanity is manifested.
But even if Cole’s mental manifestations were of this clear and decided character, and had assumed the form of the melancholia of the doctors, this is not precisely the insanity required by law to shield its possessor or subject from responsibility to the criminal laws of the land. The insanity of the medical profession, as described before you by several of its leading professor's, is not precisely the insanity of the law. They describe *332 melancholia, which seems to be nearly synonymous with a settled melancholy of an excessive, aggravated and unreasonable character, indicated by a highly nervous and usually moody temperament, and by a mind more or less morbidly affected in its ordinary functions, as insanity.
But whether these may be more or less present in legal insanity, or the insanity recognized by. the law, they are not precisely that kind of insanity or mental unsoundness which marks exemption from criminal responsibility. The law, in determining a person's responsibility for, or immunity from crime, applies a very simple but easily comprehended test, and it is this: Did the accused party understand the nature of the act in which he was engaged, so as to understand whether it was right or wrong ? Was his reason dethroned or operative? Was he able to comprehend the nature of his conduct or not? • If he was, then he is responsible to the laws of his country, is bound to obey them, and is punishable for their violation. It may be, therefore, that he was subject to melancholy in an aggravated form. So long as it does not sap or subvert the foundations of his intellectual faculties, he may be carried under the pressure of excited feeling into an outburst of passion which may be next to uncontrollable ; yet, if reason preserves her dominion over his intellectual powers, and has not yielded her throne to the frenzy of mental alienation or madness,—if, notwithstanding all this, he has sufficient comprehension of the nature of the act in which he is engaged to appreciate its moral quality, to distinguish right from wrong,—if he knows that he is doing an act forbidden by law,—he is held accountable for his acts, he must be regarded as violating the laws of his country, and must abide the fate of other criminals (The judge here read the opinions of the court in Freeman v. People, 4 Denio, 9 ; Willis v. People, 32 N. Y., 715; O’Brien v. People, 36 Id., 276).
This is all I deem it necessary to say to you on this first and principal branch of the defense. I cannot *333 comment upon the evidence in detail. This has been done in the most able and discriminating manner by counsel. And you will probably be able to come to a conclusion satisfactory to yourselves on this leading branch of the defense.
The conduct, the temperament, the bodily ailments, the mental manifestations, the personal history, the traits -and characteristics of the defendant have been pretty thoroughly scanned and held up to your view, as exhibited from 1861 to the present time. And I think I need not make any further suggestion to you in regard to them, than to suggest that, as far as possible, you bring them all to a practical test, and determine by his actual mental manifestations, as developed in his character, his declarations and his conduct, his ordinary and daily habits of life, his attention to, and capacity for business, the impression made in all these respects upon those who associated with, and knew him, whether he should stand exempt from liability to the criminal laws of his country, or had sufficient moral sense or intellectual capacity to 'be subjected, like ordinary men, to her mandates and her penalties.
The value of the medical evidence you must estimate for yourselves. You are yourselves the ultimate judges on this point. And it is upon your own judgment, as founded upon the evidence, that the result must finally depend. The opinions of medical men may have a certain value in enlightening your minds in regard to it, but it should by no means induce you to discard your own careful and deliberate judgment upon the whole testimony.
And of the existence of this fact of insanity as of all other facts in the case, you are, as counsel have been careful to impress upon you, yourselves, and not thé court, to be the final and intelligent judges. The court has no disposition to invade your province on that subject ; but -this will not, I presume, induce you to discard or reject any suggestions, coming from what quarter they may, that seem to you to have any intrinsic force ; or to aid you in "arriving at an intelligent judg *334 merit upon the case. None of us are so wise that we can safely afford to reject adventitious aid on a matter so important; and in a matter of life and death the responsibilities are too great to induce us to attempt to be too self-reliant.
Another defense set up on this'occasion is, that.His-cock was the seducer of Cole’s wife, and therefore justly liable to his vengeance. No doubt such a defense, if established, would strongly appeal to your sympathies, being regarded in some quarters as no more than a just vindication of niarital rights, and the only efficient mode of protecting the purity and inviolability of the marriage bed.
But we are not here to administer sympathy, but to execute justice ; to carry into effect the laws of the land; to enforce its solemn mandates, and not to nullify or relax its positive commands by misplaced sympathy or morbid clemency.
If our duty is clear, we forswear ourselves if we do not perform it. I have taken a general oath faithfully to perform the duties of my office ; you have taken a special oath, well and truly to try, and true deliverance make between the people of the State of New York and George W. Cole, and a true verdict render according to the evidence, so help you God.
This duty we must discharge at whatever hazard ; whether painful or agreeable, neither manhood nor liqnor, the restraints of conscience, nor the solemn mandates of the law, allow us to decline its performance or to hesitate at its execution.
Many laws may not be in precise accordance with our views of policy, or even of strict justice, yet it would lead to the utmost confusion and injustice should we refnse to execute them. If we are dissatisfied, we should apply at the proper time to the proper forum for their amendment, or seek to avert their excessive rigor by an appeal to executive clemency.
Certainly, it is to be regretted, if further legal enactments could be of any avail to restrain the unholy pas *335 sions and devilish arts of the seducer and adulterer, that they have not heretofore been made. But the wisdom and efficiency of such enactments have been questioned. It is enough for us to know that we must administer the law as it is, and have no right to usurp legislative power, and apply to a past transaction, laws of our own creation. Tue injustice and unconstitutionality of such a proceeding would be manifest, and the gravest objections to it exist. Let us content ourselves with administering the law as we find it in our own appointed sphere of duty. Then shall we have consciences void of offense toward all men, and the happy consciousness that in the spirit of our oaths, and in conformity with the obligations which rest upon us, we have, as faithful and .law-abiding citizens, executed the laws of the land.
But there are several reasons why you cannot give effect to this defense :
1; The adultery is not in proof. It has not been established" by the evidence. If that evidence has been improperly excluded, the responsibility for that error is with the court, and its correction belongs to another forum, and may be accomplished under the exceptions taken by the defendant to the decisions of the court. The statements of the prisoner are not evidence of that fact. They were not called for with any view to make them evidence for such a purpose. Their object was to illustrate the premeditated design on his part. Being" perfectly legitimate for such á purpose, and offered with that view, and direct evidence of adultery having been excluded by the court, they are not competent testimony to prove the adultery, because they are not offered and received with that view, and because there is no pretense that the defendant had personal knowledge on this subject, which would enable him to give primary or admissible evidence, with reference to it. There might be a state of facts,—for example, if a husband should rush from his own bedroorn, with a knife or dagger in his hand, red, and dripping with blood, where his statement that he had just slain the adulterer *336 in the very perpetration of a domestic wrong, contemporaneous with the act, and consistent with, and explanatory of the surrounding circumstances, might be so interwoven and blended with the transaction as to allow it to be received, in connection with other evidence, as original or primary proof of the facts themselves. But here the declarations of the prisoner do not cover such a case,—are not intended to be applicable to such a transaction, and are shown by other proof in the case to refer to occasions considerably removed in point of time from that which is the subject of your present-consideration.
The confessions, or alleged confessions, of the wife, do not prove it. They were not admitted for such a purpose, and are not to have that effect. Their introduction was permitted, not as furnishing evidence of the facts themselves, but as communications made to the husband, and which were calculated more or less to operate upon his mind, and influence his conduct, and to enable you, in the light of subsequent events, to judge how far they did so operate, and to determine to what extent the knowledge or information of these facts was calculated to explain and to mitigate, or to justify the homicide subsequently committed. As interpreting the prisoner’s subsequent conduct, as throwing light upon the state of his mind, they are admissible and pioper to be considered. As furnishing evidence to you in this case of the commission of the" adultery, they were not allowed to be introduced, and are not proper to be considered.
Hence, if you acquit the defendant upon that ground you acquit him upon a ground not established by the evidence.
It may be that the deceased was not guilty of this offense. He has not had any opportunity to try that question, and his lips are now sealed in death. We are not, therefore, in a condition to say on which side, upon a fair trial, the preponderance of the evidence would be.
It is suggested that no case has ever occurred in *337 which this evidence has ever been ignored by a jury. That is not the question. It is not necessary for us to inquire whether former juries have or have not violated their oaths by accepting as evidence, facts which have not been proved. It is a dangerous and inadmissible proceeding in a court of justice. We stand upon the recorded evidence, and no other. Whatever may be our suspicions, we have no right to give way to them, unless they are supported by the evidence in the case.
Whatever I may suspect, or you may conjecture outside of the range of the proved or admitted facts, we cannot justify ourselves to our God or our country, otherwise than by rendering a verdict according to the evidence. Neither the pressure of sympathy, nor the alleged hardship of the case, nor the sophistry of counsel, should allow us to take any other course.
But it is said that the prisoner was informed of facts tending to fix upon the deceased, this invasion of his. marital rights, and that, oppressed by the crushing-weight of such a disclosure, he rushed to the vindication of his marriage bed, under a transport of passion which every honorable heart will justify,—which the law will excuse if it does not applaud, and which jurors who> appreciate the importance of maintaining the purity of the marriage relation cannot fail to recognize and sustain.
But neither is this the just nor the legal view of the case. . It is only in the heat of passion,—in the uncontrollable resentment occasioned by the discovery of his domestic dishonor, or by surprising the parties in the actual commission of the adulterous intercourse, or under the sudden influence of a state of circumstances almost equivalent to personal observation of such a transaction, that the husband is permitted to be the summary avenger of his domestic wrongs.
He is not at liberty, after his passions have had time to cool, and the tempest of excited feeling to subside, to stalk abroad, seek out the unconscious and ump-re» *338 pared victim of his resentment, and without the inter rention of the forms of law or the judgment of his peers, become the self-appointed avenger of his own wrongs or vindicator of the violated majesty of the law.
The law must be left to maintain its own dignity and to enforce its own decrees through the constituted tribunals of its own creation, and has not in any just or legal sense commissioned the defendant to the discharge of the duties of this high office.
In this case, the adulterer,—if adulterer he was,—was not detected by the husband in the actual commission of his crime, nor under circumstances from which its then very recent perpetration, so far as the evidence discloses, could have been fairly inferred. The period of adultery,—if adultery there was,—was long since ¡passed. The knowledge or information of its commission had been communicated to the prisoner several days, ;at least two or three days before, and a sufficient time, In the judgment of the law, had elapsed for the passions to cool, and for reason so far to regain her undisputed or real sway as to forbid individual vengeance, and to pronounce the act of premeditated killing,—if .such it was,—the crime of murder.
True it is, as I have already informed you, if, notwithstanding this lapse of time, the crushing weight of This domestic tragedy had driven the prisoner’s mind to -absolute distraction, and dethroned the reason of the husband, he is permitted to find immunity from punishment in the mental alienation with which he was thus -overwhelmed ; but if he had the possession of his senses, the" exercise of his reason, and was in a situation to appreciate the quality of his acts, he stands responsible before the law for having unlawfully taken the life of •his fellow man, and must abide the stern rigor with ■which she maintains her violated majesty.
Neither, therefore, in the alleged adultery, for which -the deceased was slain, because the adultery has not "been proved, and would not have been a defense if it had been, considering the period of its alleged commis* *339 sion, nor in the crushing and overwhelming weight with which the evidence of his domestic dishonor and of the deceased as its alleged author, was brought home to the knowledge of the defendant, can the prisoner find exemption from the consequences of the homicide. He must find it, if he find it at all, in that dethronement of reason, if it actually occurred, which exempts every insane person, however great would otherwise be his crime, and however awful would otherwise be the attending circumstances, from conduct to which Ms mind never gave a willing and intelligent consent.
But there is another aspect of the case to which I feel bound to call your attention, because there is a possible view of the evidence which you may feel at liberty to take which will reduce the grade of this offense from murder in the first degree to murder in the second degree, or manslaughter in one of its various degrees, and more particularly to manslaughter in the third degree, the punishment of which crime is imprisonment in the State prison for the terms which I have before mentioned.
I have already stated to you that murder in the second degree embraced all other kinds of murder than murder in the first degree, and, though not well defined in the statute, might fairly be supposed to include that kind of murder which was not characterized by that degree of enormity, or of premeditation, which might be supposed to constitute murder in the first degree, and to be justly punishable by the forfeiture of life.
If, therefore, your view of the circumstances of this case shall enable you to take this more lenient view of the conduct of the prisoner, to which I have just referred, you may find him guilty of murder in the second degree.
Again, if your view of the evidence, acting under the responsibility of your oaths, shall enable you to take a still more lenient view of the evidence, and to *340 conclude that the intent of the prisoner was not to' produce death, and that the homicide was committed, not with premeditated design, but in the heat of passion, by the use of a deadly weapon, then it will be your duty to convict the prisoner of manslaughter in the third degree, the punishment of which crime is imprisonment in the State prison for a term of not less than one nor more than four years.
As heretofore stated, the radical distinction between murder and manslaughter is the presence or absence of a design, or premeditated design, to effect the death of tile person killed. If you have rational doubt on that point, arising under the testimony, and justly founded thereon, it is the benevolent intention and the positive injunction of the law, that you should allow it to operate in favor of the prisoner. And if, in the dispassionate judgment which you shall give the case, you shall come to the conclusion that, though you believe the prisoner to have been driven to the borders of distraction, yet not actually to have entered its domain, and therefore feel bound to hold him responsible for a violation of the law, and yet believe him to have been urged to the terrible catastrophe with which this domestic drama has terminated, by the crushing conviction of his domestic dishonor, and with a force, and precipitation, and pressure, which deprived his act of homicide of that premeditation which stamps it with the legal ingredient of malice aforethought, you are at liberty, under such circumstances, to negative the element of premeditated design ; and, finding the act committed in the sudden heat of passion, and by the use of a dangerous weapon, to declare the legal consequence of such killing by pronouncing him guilty of manslaughter in the third degree.
The responsibility of determining the facts by which the grade of the offense is to be measured, is, of course, with yon, and not with me, and you must determine it under a solemn sense of the important consequences which rest upon your decision.
It has been suggested that a verdict of this charac *341 ter, finding the defendant guilty of an offense of a less grade than that charged in the indictment, will not be acceptable to the prisoner, who desires a full acquittal, or a conviction of murder in the first degree.
Allow me to say, gentlemen, the preferences or wishes of the prisoner, on this point, should not, in my opinion, affect your action one way or the other. You have a higher duty to discharge than either to please or to offend the prisoner or the people. You are to find a true verdict according to the facts established before you. You are to declare it without fear or favor, and without reference to the wishes of either side.
You are not to be precipitated into a verdict of absolute acquittal, because a conviction of murder in the first degree would be too severe to correspond with your views of duty. You are not to be withheld from a verdict of partial conviction, if a verdict of greater or less severity shall not faithfully record your conclusions from the evidence. You must find a verdict founded entirely upon your own view of the testimony, as it has engraven itself upon your minds.
You should also be careful not to be carried by feelings of sympathy beyond the boundaries of duty. You may justly and properly entertain a feeling of respect and gratitude to General Cole for his gallant services during the war ; but when he appears in this tribunal, and is summoned to its bar to answer for crime, he is, like all other men similarly situated, to be tried by the law and the evidence. Neither gratitude for his military services, nor sympathy for his unmerited sufferings, nor regret for his domestic calamities, can annul or impair the stern requirements of duty.
Nor, on the other hand, must you be betrayed by abhorrence for a homicide, appearing, if you so regard it on the first look at the transaction, to be without justification or excuse, into a rash and precipitate verdict of conviction. The case has various aspects, all of which you must consider, and no more conscientious oi imperative duty is demanded of a jury than to keep *342 its judgment in suspense till every fact is carefully examined, and its just weight and bearing faithfully determined.
You find in the prisoner, perhaps, an individual laboring under melancholy, more or less, whether or not it has attained that intense and aggravated character expressed by the melancholia of the medical profession. You find him, it may be, materially changed in his disposition and temperament, his tastes and his habits, from what they were at a former period of his life. Life, it may be, has lost for him many of its charms, and bodily ailments and injuries have not only subjected him to much pain and suffering, but have so destroyed or impaired his health and his constitution as to render life a burden rather than a blessing.
All these things, under proper circumstances, and on a proper occasion, may make him a fit subject for your consideration and sympathies. But this is not the period when you are to seek their indulgence, at least, if they operate so far as to distract your mind from the performance of a sterner and higher duty. Not, indeed, that you are to forget that you are human, or that you can be expected altogether to divest yourselves of those feelings and sensibilities which are implanted in every manly and generous heart. But that you are to be careful not to be led away by them from the performance of duty, or into forgetfulness of the stern obligations which rest upon you as impartial arbiters of the prisoner’s destiny.
True, indeed, if under the influence of the evidence you conclude that the prisoner’s reason has been dethroned, and that he was not at the time of this transaction an intelligent agent, having the power of mental discrimination between right and wrong, in regard to the particular transaction which you are undertaking to investigate, he must stand acquitted before you upon the ground of criminal irresponsibility. But If he had this power of mental discrimination, and could distinguish in regard *343 to the moral qualities of his conduct, then, notwithstanding your pity for the man, and your sympathy for the sufferer, you must condemn the criminal. And especially you must not be led aside from the path of duty by a recollection of the severe rupture which has taken place in his domestic relations, unless the deceased is proved to have been connected therewith, and in some sense the author thereof, so as justly to call down upon himself, within the limits of the law, the just vengeance of an injured husband. These injuries, at least as intelligence of them was communicated to him, were of the most heartrending character, and must, of necessity, excite the ardent sympathy of every feeling heart.
It may be difficult, perhaps impossible, wholly to divest ourselves of these feelings, but we shall fail to meet the stern and inexorable necessities of this hour if we allow them to turn us aside from the path which the law has appointed for us to tread.
That path is the path of duty, that duty is to find a verdict according to the law and the evidence, and whether it enjoins upon you the agreeable task of pronouncing a verdict of acquittal because the evidence fails to satisfy you beyond a reasonable doubt of the guilt of the prisoner, or of his responsibility for crime, or the painful one of pronouncing a verdict of conviction," because the evidence satisfies you beyond a reasonable doubt of the prisoner’s guilt and responsibility for crime, you will, I doubt not, acquit yourselves like men, and, without fear or favor, without partiality or prejur dice, discharge the solemn and responsible trust which the law has imposed upon you on this occasion.
In this confidence, I commit this case into your hands for your final deliberation and verdict.
In relation to the specific points submitted by the counsel for the defense, and asked to be made part of this charge, I charge the law upon the subject of insanity to be in the authorities I read to you.
Mr. Brady.—With reference to what has been said *344 by the court, upon the question of finding the accused guilty of manslaughter, I desire to say in behalf of the prisoner, that in the judgment of his counsel, there is no rational or possible view by which the offense can be demonstrated manslaughter, and that the prisoner declines to accept the offer of that sympathy that would induce a verdict for that offense, and would rather die than be sent to State prison.
The jury retired, and subsequently came into court, when the foreman stated they had not agreed upon a verdict.
Hogeboom, J.
—I have a note from you in which you request to have further information, with reference to that portion of the charge which relates to insane impulse and ungovernable frenzy, and the rules of • law governing the same. I designed to express myself with sufficient fullness, and with all the ■ clearness and perspicuity with which I was able to do upon those subjects. I will restate, or further comment, on these points, that the foundation of all responsibility for crime is sanity or soundness of mind, that is, a sane mind in the sense in which I explained it to you in the original charge,—the possession of reason, ability to discriminate between right and wrong in regard to the particular transaction, a degree of consciousness and intelligence that enables a party to appreciate the quality and nature of the act in which he is engaged; to be aware that it was wrong, if it was wrong, a crime, that he was committing an offense against the laws of his country. If his mind was in such a situation, he was, in my opinion, and as defined in the cases to which I have referred, subject to" those laws, responsible for their violation, and to be punished if he did violate them. That is substantially the test in regard to both those species of offenses to which your attention has *345 "been called. An insane impulse, leaving the mind incapable of exertion, holding the individual incapable of exercising his mind, so far as I have defined it to you, exempts him from responsibility, and if, under the influence of such a want of mind, the prisoner commits the act, whether you call it an insane impulse or anything else, it exempts him from responsibility. Mere impulse, whether you call it irresponsible impulse or not, does not excuse, if it be the impulse of excited passion arising from revenge, from resentment, from intention to do an act which is wrong or a crime, and the prisoner is aware of it. Whether he is impelled to it by peculiarities of temperament, by a nervous disposition, by excited feeling, or anything of that sort, will not excuse him from responsibility.
If there is the consciousness that he is committing: a crime against the laws of his country, there is, in my opinion, no impulse that can excuse him from responsibility. But if this impulse arises from a defect of reason, so that it cannot control the exercise of his mental powers, if he is bereft of that power in the sense which I have alluded to, and this crime is committed in such a condition, and without the ability to control himself from such a cause, he is in such a condition as excuses him from responsibility.
The question, after all, is, whether he has his mental powers, and the ability to exercise them to such a degree as makes him conscious, at the time, of the nature of the act in which he was engaged. He must not give way to unholy passions, to excited feelings, to a disposition for revenge or resentment, because it is just these feelings that the law punishes and makes him reponsible for them. Men must curb and restrain their passions. But if he is bereft of 'the mental power to reason upon the subject and understand the nature of the act in which he is engaged, then the law relieves him from responsibility.
If he acts from ungovernable frenzy, it must be the frenzy of madness or mental alienation, and not of ex *346 cited and inflamed passions. If a man has sufficient consciousness of the nature of the act in which he is engaged, to know that he is doing wrong, and violating the laws of his country, and yet gives way to the feeling of resentment or revenge, and gratifies it at the' expense of his consciousness that he is committing a crime, whether that frenzy is of the highest and almost irresponsible degree, or not, he must be held responsible. But if this is the frenzy of mental alienation, so that he cannot control the powers of his mind, and is incapable of appreciating the quality of his act, or to understand that he is violating the laws of his country, or doing a thing that is morally wrong, then he is exempt from responsibility.
It is very difficult to define these matters with absolute precision. I can only refer you to the general rule laid down in the cases I laid before you in my charge to you, and I read from them intentionally for the express purpose of defining the rules by which you are to be guided, and to explain the circumstances which exempt a person charged with crime from the responsibility of that crime.
I do not know that I can do anything which will inform you in any*greater degree of what constitutes that degree of insanity or mental alienation which excuses a party from criminal responsibility. The party is never responsible for defect of reason ; it is a providential dispensation which relieves him from the imputation of crime, because it is not the act of a free, intelligent, and conscious mind. I think that every one is bound to control his passions and feelings. If he has the power of thought, and ability to reason, he must be held responsible to the laws of his country, and not give way to unholy passions, or excited feelings, or wicked resentments, or revenge. On these questions you must be satisfied.
Mr. Brady.—If there be any doubt, the benefit of it goes to the prisoner.
*347 Hogeboom, J.
That doubt goes to the benefit of the prisoner, if it be that kind of rational doubt, upon the evidence, or doubt which commends itself to the rational mind, applying itself to the facts of the case. It is not the mere possibility of innocence that should .justify you in finding a verdict of acquittal. The question is whether, on your considering the case as rational men, you believe beyond a rational doubt, a fair, reasonable doubt, commending itself to your understanding, that the party is guilty and criminally responsible under the rules I have laid down, you must find him guilty. If you do not thus believe, if you have a rational doubt upon this subject, as thus understood and interpreted, you are to give the prisoner the benefit of that doubt, and render a verdict of acquittal.
The jury again retired. Subsequently they came into court, and the foreman stated they found the prisoner to have been sane at the moment before and the moment after the killing ; but they were in doubt as to his sanity on the instant of the homicide.
The judge charged the jury that they must give the prisoner the benefit of the doubt, if they had such rational doubt, founded upon the evidence, and could believe such doubt to be well founded upon such a condition of the case as was presented by this statement of the jury.
The jury rendered a verdict of Not Guilty.